Petition bob a e hearing by h. ceay anb jas. HAGGIN Esqs. .
The progress of this cause has been rather singular, and unfortunate if exactly fair. When the brief of the appellants was read, it was supposed to contain epithets and imputations indecorous and unmerited. Under that impression, and an assurance of the counsel of the appellants, that he would revise and expunge whatever might be found exceptionable, the attorney of the defendants handed it to him, expecting, when corrected, to be again favored with its perusal, but he heard no more of the brief or cause until the evening preceding the delivery of the opinion. He, therefore, presented nothing of his views to the court, although the cause was of great concern to him.
The brief of the appellants was fraught with high sounding denunciations, and the most earnest appeal to the commiseration of the court, reiterated for about twelve sheets — such as could not have been justly answered without an outrage upon good order and decorum; therefore., it was returned, and resumed for correction; and not from an apprehension that the suspicion or fraud against the '¿rustees or either of them, as relates to this transaction, could be created, nor that sympathies could be roused in favor of an appellant, who, for the paltry consideration of one hundred dollars, advanced upon an unlawful transaction, would hold an estate worth four or live thousand, to the ruin of creditors and Trustees. Eut the suit was of some novelty in our country, if not in the annals of jurisprudence, and. it had commanded much of the consideration of one. of the appellees, and he did desire to be heard upon the principles involved.
It must not be supposed that any undue excitement is charged. It is certain that the rights of creditors have not been forgotten. They are even .advised that the trustees, or one of them, who engaged in their service under many inccavenifcaceF *456 and great hesitation and without motive except to o'blige, must account for the uttermost farthing.
li^Saifd’on Ttusts, 196.
The principles and motives conducing to this re-suit, it is most respectfully bbiieved, are at variance wjjlj authority and precedent, and the tenor of the °pin'on imposes upon the counsel a higher obligation than that of a pecuniary character — He therefore seeks a re-consideration.
He is entirely sensible how inexpedient it is to importune this cour,t by tedious argument, and shall certainly endeavor to abbreviated® indeed he does not suppose many questions involved", but there are so inány matters recited with apparent emphasis as though they influenced, which therefore, may require remark, that he fears to read his petition will prove an unpleasant task.
it is true, that many debts áre recited in the deed of trust, and a description of property, from which it might be infered that but little estate of the debt- or remained: yet debtors may have been omitted. This can be no objection to ' he deed. At any time before judgment, a debtor may by mortgage or deed of trust, secure'any creditor He may do this to several in succession And sui-ely it may be doné as well by one, ás several instruments. By this, every piece of property is specified, every creditor and his demand is defined; creditors and purchasers can all see, and appreciate the lien, and their own prospects, and assert their rights against tito surplus, as amply ás if there had been divers deeds.
It is equally true that the interest of Williamson, after payment of the debts,- is expressly avowed. But this is no more thán -would otherwise be implied snider the doctrine of resulting trusts now familiar in our courts, and the expression of that which is implied, certainly cannot prejudice. If it operates any thing, it enures favourably to the neglected, creditors.
Nor is it an exception to this deed, that Williamson had but au equity in the property, the price of which, was but partly paid before execution of the deed of trust, it is the universal practice, sanctioned invariably, fo mortgage, or assign by deed of trust equitable as we!! as legal titles in real and *457 personal estate, anti Mr. Williamson, *by the nature of his covenant, was bound to perfect the titles. And loss important would seem the suggestion, if proved, that payment to Sanders was effected by the lottery -tumis — therefore the contrary was riot tempted.
The deed of trust has not been declared bad — It assuredly was not in its origin — ft is prior in point of time, arid founded upon the highest consideration known iti the law: the object being to secure Iona jide. creditors-. Then it must prevail, unless impaired by subsequent events.
White cannot controvert the deed of trust, nor rights acquired under if for the following reasons:
1st, He had notice of it in presumption of law anil ih fact.
2d, Because he claims under a lottery, forbidden by the letter arid policy of the law, and
3d, Because- his .purchase is not founded upon a valuable consideral ion.
As to notice. The deed of trust was regularly recorded and conferred nonce to all. it may be said, that the recording a deed designed to convey laud, where a defect shall be found in any link of the chain of title; avails nothing, because such a deed does not secure the conveyance of the land and is not, therefore, embraced by the statute. But equitable titles in land or personalty may be assigned in trust or in mortgage, to secure debts, and such in-instruments are required to be recorded by the Sta. of 1748. For it uses the words <sa!S deeds of trusts and mortgages whatsoever.” And the publicity of the circumstances out of which this deed sprung, and those immediately ÍEowing from it, as alledged and proved, justify the presumption of notice in tact.
Touching the illegality of the transaction. The legislature, of Virginia, at a very earlv day, denounced nil lotteries as of immoral and injurious tendency — Sometimes that department adopts one and sometimes another mode, for the suppression of mal practices, at its discretion. And although the courts may % iew with a benign eye, the- ma,n who has (in the language of the court) been ileeoed of iris money and sues to regain it still, when they snail *458 be required ío act upon the. lottery man, who has imprudently squandered that estate which is indis» pcnsible to the comfort of his family, and the rights of just creditors, surely there is equal cause to say, Í find no merit here. Which party did the legislature mean to protect? I answer both; its purpose was to put down lotteries, and save all from their pernicious consequences. Just as it designed, by acting upon the winner, to suppress gaming at cards; the suppression of vice the object — tlio infliction of punishment its means Prior to any statute on the subject, the court of law had averted its face from the gamester, and chancery interposed; and subsequently they have gone further. and relieved otherwise than within the provision of the statutes. The enquiry now is, was the transaction against the spirit and policy of the law? and the practice is, to decree accordingly. See 2d Vernon, page 70, 291. Newland on Contracts, 469 and 495 inclusive.
Touching the objection, that White was not a purchaser for a valuable consideration, and there - fore cannot prevail against creditors with a prior lien, neither argument nor authority can be necessary to maintain this position, I am very certain,'as a general rule. He who would impugn a fraudulent deed, must shew himself to be a creditor or purchaser for valuable or adequate consideration, and it is not very certain that such a creditor or purchaser, with notice, may not successfully arraign any voluntary conveyance, and the man who claims by winning or drawing in a scheme forbidden by the law, is in this respect upon an equality with a donee; at least, the gamester has no preference, Sugden 481, Cro. Eliz. 444. Cowper, 705.
It is however objected tons, and this seems to bo the chief reliance for the opinion, that the creditors and trustees knew of the Lottery, and did not suppress it, and that one or two of the trustees fostered it, became parti ceps crivúnis, 'and thus have violated the deed, au'cl all sales which they may make &e. Here ‘is a combination of rules and principles utterly incongruous, and deductions of fací hardly maintainable from the premises vrarc'}. *459 Perhaps it does not appear that either of the trustecs has any interest in the property in controversy, for the answer of one defendant is not testimony against another; and on this subject there is no other proof. Rut to the principles.
2 Mar. 108.
3 Mar. 14?.
Where one stands by and sees his estate sold to another for'a valuable consideration, without making known his claim, he is compelled in equity to yield his tifie. And there is such a maxim as that recited in the opinion relative to particeps criminis. Rut none can well be an innocent purchaser for .valuable consideration and a particeps criminis in the same transaction.
The progress of the first of those principles in this court is rather singular. In the case of King ■and Hawkins, it appeared that Wyatt and Hawkins being brothers-in-law, settled and improved adjoining farms in the county of Jessamine; that Hawkins determined to move to Green river, and desired Wyatt to go with him. That Wyatt received a proposal from King for the purchase of his farm, and communicated it to Hawkins, who advised him. to take it, and he accordingly closed a contract, gave possession to King, and moved with Hawkins to Green river; and King remained in possession, believing his title perfect, and improved accordingly, for upwards of fifteen years, when Hawkins died, and his heirs sued for the land. This court first decided they had no power to relieve, because of the statute of frauds and perjuries; aiid upon a rehearing, they ultimately determined, that as Hawkins was not present at the contract between King and Wyatt, and did not. advise King to buy, although he persuaded Wyatt to sell to him, that his case could not be brought within this principle of equity, and King was ruined.
in the case of Bobb &c. against Morrison, died by the court, it decided that as Morrison was present when Jordan sold the lot to Bobb and Spriiigle* for a valuable consideration, and did not make known his title, that he must convey. And now it js said, that as the trustees were privy to the lottery and promoted it, although they were not present at the sale of a ticket or the drawing of a prize* and *460 although While was not a purchaser for a valuable consideration, the creditors and purchasers under t[ie trustees are concluded. • Surely this is in direct conflict with King’s caáe, and surpasses every thing to be found in the books. 'Thc'reason for the exercise of this jurisdiction, is to 'be foil rid'in the delinquency-of the proprietor himself, and never i'n tiie default of his agent. For this purpose there never was, nor indeed can he an agency. And it is confined exclusively to a purchaser J'or valuable consideration: I can find no exception.' -
As to the parheeps cmninis, it is a rule which comports much belter uith the vindictive-spirit of the law, than the benevolent fadings of the chancellor; one which the judge cannot admire, and han laboured to qualify, (as in (lie case'where the purchaser of the ticket sues for his money,) and which the chancellor never sustains' but with regret, and has almost exploded, where the object is to correct the error, and restore the-parties to their origina* rights. Thus the gamester’has received bark hit money, and obtained other relief’where, the statute was silent. Marriage brokago bonds have bcei: cancelled, and bonds for the sales of offices decrecí to ho surrendered, and the effects of other outrages upon the law and'its policy, avoided’, although within the provisions of nq statute. '
But in wlmt, did the creditors or trustees participate? Did they put up, bad' they share or interest: in Hie lottery? It is hoped they will not be charged with gambling, if they barely -look on, and neither play nor bet. The overt act would seem to consist in dissuading Trotter from the publication of a hand! ill protesting against'the lottery. It is uniieccssary'to recapitulate the admissions or proof in this respect. Their effect is no more. The law huthorizes the seizure of the stakes in the rare field; yet Who would not advise his friend to decline ad attempt o'f that kind. And shall'hc therefore be pronounced parlieeps criminisÍ
I have ever experienced a great repugnance to handbills and libels of every kind. They-are generally the indication of had feelings, and apt to produce their kind, and I am yet to learn if they an- *461 prescribed as a proper remedy in any case. Had Trotter posted this bill at the door of the courtbouse, Williamson would have resented it as a malicious attack, a riot’would have ensued, but I prosume the lottery would hávc progressed. Certainly it is but fair to say, that the motive for the interference between Williamson and Trotter, was the conciliation of friends, and that it did not constitute those giving the advice, participators in the lottery. And although the purchaser for a valuable .consideration may complain that he lias sustained injury by a failure of those who hold the true title to apprize him of it, when they knew him to be engaged in a contract for the purchase of the property, yet it never lies m favor ol‘ one whose claim js founded upon an unlawful transaction. He was forbidden by the law, and additional prohibitions cannot be required. At most he is only injured to the amount Of his advance, aiid can only expect its reimburse^ meat.
It is said that Prentiss can derive no title under the trustees, because they encouraged the lottery, and thus vitiated the source of his equity. The chancellor has long asserted a c.ontroul oyer defaulting trustees: where they have never undertaken the duty, he appoints others; where they have assented, he compels them to proceed and close the transaction; If the trustees upon such request from the creditors as proved in this cause, had refused to sell, the court upon a bill filed, would have coerced it. Say then that, the trustees have erred, but without suit have resolved to correct their error, find sell. They who look at the subitáneo of things, could hardly object to this. _ That has been done without suit which the court would have compelled. ‘This notion of the contaminating influence of an error, vitiating all acts of an agent, although rightly done, until absolution shall be obtained through the medium of a chancellor, may sound well in theory, ami has some authority in spiritual matters; yet for practical life, and in this nether world; is too highly refined, and remains without the sanction of a temporal court. Sugden p. 487, says., itoat where one enfeoff another by covin, or without. *462 valuable consideration, and the feoffee make a feoffment for valuable consideration, and the first feoffor enter and make a feoffment for valuable consideration, tire feoffee of the first feoffee shall hold; yet the first feoffee acquired title by fraud. In the case of Stores, referred to by the court, the man who had made a valid contract and conveyance, liad obtained and at the time of the sale held the title by fraud. It cannot well happen that two cao hold tinder one grantor, without the commission of a fraud by such grantor. This indeed' is a strong case against the position assumed by the court. The deed stood free from imputation; and the fraud, if any, was not in the sale to the complainant, for that was a duty. This is moreover a sale by cestui ijuc trust, for they ordered it, and they could sell in equity. Sand, on Uses, p. 209.
Tiie deed and every thing done under it were just. The fraud consisted in suffering the country to be deluded. Let those who have suffered by that fraud sue and recover to the extent of their injury. What is that Just what they have lost by the persuasion used with Trotter. If it can be supposed that Mr, Trotter’s hand bill would have suppressed the Lottery and prevented the payment of the price of the ticket, then perhaps they who gave that advice should reimburse it. It is very certain that the Trustees by fostering theLoitcry neither inlaw or conscience injured Mr. White to the value of the farm, nor did.they confer aponhim a just right to it. That remains in the creditors, or those to whom the sale was made.
What would have been the extent of Williamson’s liability ip Saw, or equity, if White had not received the deed? Ris money with interest. If other purchasers did pay, they had a right to recover it again. The conveyance to White was no bar to, their action, and of pourse, the payment by them, no additon to his demands. The complainants', therefore, deemed it impertinent to prove how few had paid for the tickets.
The opinion say’s, “it does not appear that Prentiss has paid the price.” This could only be required, .provided it could justly influence the de.^ee i.n this cause,.
Hb ^ lg!í’
The Trustees and creditors make the sale, take the security, and confer upon him all their equity consenting that he shall have the titie, a consent which they have not yet retracted. It is not gested by White that the creditors have or can be paid and indemnified, otherwise than bvthis means.
The sale then was iudispensibie, and White had no remaining hope in the land or its proceeds. It is immaterial to him, whether Prentiss had or had not paid. But betwce.n the, creditors and trustees and Prentiss, it stands that he- did pay, and is entitle, to a deed. As relates to White nothing is alledgcd, that can render it of any concern whether Prentiss paid or not. And tins is not a suit for a settlement of the affairs of the- trust. If it had been deemed material, sufficient is avered to justify the appointment of commissioners to make the enquiry.
In precise conformity to a deed duly made, upon the highest consideration known to the law, Prentiss lias acquired the prior equity. None except creditors or purchasers for a valuable consideration can question it. And being a bona fule and specfic lien, even against those it must prevail.
It is certainly true in relation to trusts, that no fraud or default of the trustees, even wheré they com bifte, can prejudice the interest of cestui que trust.
Sanders on uses, p. 193: says, “If a trustee commit felony, treason, die, without heir, devise the estate, become involved, bankrupt, incumber tho property, cestm que trust will hold ¡Veo from all forfeiture or incumbrance. And the same author says that, there.is but. one means by which the trustee can affect the right of cestui que trust, and that is by conveying for a valuable consideration and without notice; See Sugden 544; 3d Peere Williams 215.
Hero the participation in the fraud is only imputed to two of four trustees, who in relation to the estate could only act jointly.
The subject of the lottery attempted by Williamson deserves consideration under two aspects.
1st, As it respects Williamson himself, and White; and,
'hi. As it regards the trustees
*464 Williamson’s lottery was clearly forbidden by law and, therefore, illegal, it was illegal as it respects all parties. It cannot be considered as legal on the part of the purchaser of a ticket, and illegal in respect to the vendor of the same ticket. 'The law makes no sue!) discrimination. It denounces, without reservation, the lottery, in all its parts and parties. Let us. stop for a moment to enquire into the situation of White when he purchased the ticket., lie intended to buy and Williamson to sell a ticket which should entitle him to the prize which, by pos sihility, it might subsequently draw. He did not, purchase the land in controversy, but the chance, or contingency of drawing it, or any other price, which fortune might assign to his ticket. Now all this was illegal, being expressly forbidden by law., Be could not lawfully purchase, through the insicn mentality of a lottery, the estate in controversy; because such a lottery was forbidden by law, " lie could not, for the same reason, buy the chance uv contingency of purchase. The most then, at the moment of the purchase of the ticket, that can be said iri behalf of While is, that he expended glOO. the price of the ticket, on an object interdicted by law. Doubtless he could immediately have sued for and recovered back tlikt sum from Williamson, or whoever else he paid it to, upon the ground of a failure of the consideration, unless his participation in a forbidden object would have constituted a bar. And this $100 with its interest, it is most respectfully suggested to the court, is the utmost limit of any claim legal, equitable or moral, which White has upon any one, in consequence; of the purchase of the ticket.
Suppose Williamson had never created any trust, and had possessed the legal title to the estate in controversy, could White have compelled him to convey the estate, upon the ground, that he bad drawn it as a prize against a ticket which he had purchased in his lottery! That he exprcsssly assented to the lottery is undeniable; for be, Williamson, made the lottery. In his ease, there would have been no necessity to infer, from his connivanee, an implied ascent, to the loiter); amito have biduuied him. wit’ *465 fraud in not complying with the conditions of the lottery. For Use lottery was of his institution, ami undoubtedly upon the supposition which has been made, he would have been chargable with fraud, if fraud can be imputed to a man for declining to do that which the laws of his country discountenance and prohibit. 1 would repeat again, or rather put in another- foria the question: Suppose I make á lottery to-morrow, and endeavor by means of it to dispose of my real estate, and other property, which lottery is not authorized by special act of'assembly,' suppose I make the most solemn and repeated assurances of my determination to convey the, estate t.o whoever draws it; the lottery proceeds; and the holdor of a fortunate ticket demands of me a conveyance of my estate; can he compel me to make if? Let me add another supposition aniMhat is, that the litio to ihe real estate which I would thus aliénale by lottery is in my friend. and this friend unites with me in proclaiming to the .world f hat he will convey the estate to the holder of the successful ticket, attends the lottery, and assists in drawing it; caí: my friend be compelled by such holder, by suit, in chancery, or otherwise, to convey the. estate? It is most respectfully believed that both these questions must be answered in the aflinnative before "White’s heirs can lawfully prevail in the present controversy.
Secondly. As to the Trustees. Having shewn that Williamson could wot, in derogation of the law of the land, set up a lottery, and create a responsibility on Ins part to convey the estate, proposed to be gambled off by that lottery, it would seem necessarily to follow that, neither could his trustees be bound to convey. Could the trustees even have united in the'schchic, co-operated in the sale of the tickofs, and assisted in drawing the lottery, and by ali or any of these several acts placed themselves under an obligation to convey the property? it is confidently believed they could not. prohibition of ail lotteries, is a prohibition of all lotteries whether by trustees or others, or whether by express act or by implied means. The acts of the legislature snare none; lliev denounce all; they the *466 they prohibit therefore all the means to accomplish that forbiddcit end, whether direct or indirect, express or implied. It is fairly to be infered from the reasoning of the court, that, if the trustees had been ignorant of Williamson’s lottery and had given no countenance or assent to it, a different decree would have been thought to be proper. Rut, if I am right, no act of the trustees, however solemn, and unambiguous and express, could have ghen validity to that lottery, and that simply because that lottery was prohibited by law. Now if the trustees were disabled by an express act to make legal what the legislature had made illegal, certainly that effect could not be accomplished by inferences drawn from the conduct of (lie trustees. A lottery is a species of gambling, and is so treated and considered. Now let me suppose that I was present when a gambler should undertake to sport away a part of my real estate, I did not forbid it, I even encouraged tlic'playj the stake is lost, am I bound to convey it? It would give to this paper, already too much drawn out, a most unreasonable length, if all the conduct of all the trustees were now to he commented and dwelt upon. A single circumstance, uu which the court appears to have laid much stress, will he noticcdj arid (hat is that Trotter, one of the creditors, was induced, by tjj'o of the trustees, “and especially one who appears to be the real owner off this farm,” to desist from putting forth a publication prohibiting the lottery, ’This circumstance, if it is entitled to any force, must derive if from the tendency which it has to shew that the trustees assented to (he lottery. Rut it has'been already attempted to be sVtvwi that, if their assent to the lottery-had been yielded in the most authentic, express and solemn form, it could not have rendered it valid. Now what would Sir. Trotter’s prohibition have awounted to? Could it have had more effect than the existing law of flic land u Rich prohibited fhcioftrry? Or coukl* that huv ha* e acquired any new obligation or force, by having stiperatlded to the authority of its interdict the prohibition of a private individual? The public is -aid to have been cheated by the sale* of lottery tickets in Williamson5;; lottery. Rut fire. *467 public must be presumed to have known its own law.
Or let another supposition be made, that ail parties supposed it well enough that the loitery should proceed, that the tickets should be sold, and the .proceeds applied to the payment of Williamson's debts. It is highly probable that this purpose was generally believed to be legal and innocent, and further, it is most probable that it would have been effectuated if there bad been a punctual payment of the price of all the tickets. But in the progress of the business, the lottery is discovered to be illegal» purchasers of tickets refuse to pay for them, the scheme is totally defeated Is it right that Mr. "White, who is only out of pocket §100, should recover the entire farm in dispute? Will not most full justice be Uone .him by a return of the- glGO with interest? If the public generally lias been defrauded ought he alone to profit by it? The price of the property, of which disposition was attempted by the lottery, is the amount of all the tickets which were sold, subject to customary charges. And it never c.an he pretended that the land has been paid for unless it be shown that the tickets have been all paid for. Is it right to hold Williamson or his trustees bound to pay the prizes of the lottery, whilst the purchasers of the tickets are held exonerated from the pay merit, of (lie price of the tickets? Is one party bound and the other free?
With great deference to the court, it is believed that the derreesy-enmes that the price of the land in controversy was the §100 paid by White, whereas the price, in fact, was the aggregate amount of all the tickets, at least that constituted the estimated value of all the property which was lotteried off. Let Mr. White, shew that the-tickets have been ail pgid for, with only tiie usual losses from insolvency» sand then he may come forward in the name of fim public, and claim that since that has been defrauded» be ought to recover the controverted land.
The case before the court is one of a joint trust. Ought the separate acts of some of the trustees to affect the estate, and divert it altogether from the objects of the trust? In all the c a-.es where a bystander mortgagee loses his prior lion,- or a by* *468 slander loses his property, the forfeiture is Che result of a’ culpable silence to the detriment of an innocent and bona fide purchaser engaged in a lawful transaction Is that the case before the Could White he allowed to aver ignorance ml'the law prohibiting lotteries? Was he an innocent and bona fide purchaser of the property? Has Ac-paid a full and valuable consideration for it?
Trusts are the creatures of courts of equity, highly favored, always protected. Trustees are even forbidden to do any thing contrary to the trust, Purchasers arc often ho. or id to look to the subsequent application of Use purchase money paid for crust property, and to see that the trust is faithfully executed. “Í do not recollect any case where the trustee alone can affect the trust estate by forfeiture or by incumbrances.”- See Sand, on uses page 192-3-4.
What is the condition of the cestui que trust! He lias lost the estate and he has lost the price of the tickets, not recoverable at law.
But it in said that the creditors are not without redress; that they may srie Ibe trustees &c. Which of the trustees? They are not liable for the conduct; of each oilier. Would an action on íhe case lie? Would a bill in equity? The court is entreated to consider what woo.ld be 1 ho form of the declaration In such an action; what the. allegations in such a hill. Would the dissuasive of Trotter's publication be the ground of recovery in the one mode or.the other? It is confidently believed, with the greatest deference to the court, that the creditors would he found practically to be utterly remediless.
There are many other considerations, which, but for the want of time, and in consequence of the great length of this petition, would be. submitted ;;> the court. There exists on the part of the counsel of the petitioners a strong desire to argue this .cause, a firm but respectful conviction that,- moi e deliberation, and a fuller view of the whole subject,, would bring the court to^ conclusions different from those which it; has adopted; and in conclusion the petitioners humbly pray that the court will order i>, ¡re-hearing.
*469 ANSWER OR THE APBEXXANTS TO THE PETITION, BY ROBERT WICK.XIPPE, ESQ,.
The counsel for White's heirs feels himself called upon, before he notice the argumentative part of the petition of tue counsel for defendants to defend himself from the charges or insinuations contained in said petition.
This repliant states that it is true, that he did, at the most earnest and repeated solicitation of Charles Humphreys, Esq. with the assent, of this court, agree to submit this cause upon a brief, and this he declares he did wi h some reluctance, aud great inconveníame to himself; but Mr. Humphreys having declared that he had his brief ready which contained all he wished said, and his'exireme desire to have the cause decided last fall, this respondent consented to throw aside his other pressing business; but at the same time asked Mr Humphreys if Mr. Hag-gin did not wish to argue it; Mr. Humphrey's said not, that Mr. ilaggin had sold out to him, and that he was contented to risk it. And this repliant will further state that, as well as he recollects, the cause was wholly managed in its final trial by Mr. Humspiiroys; and although Mr. Ilaggin knew of the trial, tie certainly, according to his uesl recollection, withdrew from court, or took no part in it; this circumstance added to the connexion between Mr. ilaggin ami Mr. Humphreys, am! the respectable standing of Mr. Humphreys, left no earthly doubt on his mind that the entire control of the cause was confided to Mr. Humphreys, ’
The understanding between Mr. Humphreys and this repliant was, that each was to hand in his brief, and Mr. Humphreys, before he left town, informed him he had left his with the jqdges, which this repliant never saw, nor did he think himself entitled to sec under the arrangement. This repliant then in. much haste wrote out his statement and handed it to the judges, supposing that all remarks as to counsel were closed; but to his surprise he learnt from Mr. ilaggin, that the court liad furnished him vvilh this respondent’s written statement for his reply, and be complained that some of Use remarks were harsh *470 ami personal, on which this repliant answered thaS he certainly considered the cause at an end, and that he never would have consented to have surrendered his right to conclude the cause, and acceded to the proposals of Mr. Humphreys, if he had expected that his remarks were to he replied to. But if Mr. Haggin would oblige him with the statement, he would correct any expressions which were needlessly harsh or severe; that he had written in haste and at a moment of some excitement, and was only tenacious as to the argument, and would be happy to remove any unpleasant expressions, so that he preserved th<> sense. This happened in Lexington, Where Mr. Haggin was, in February last, wlu> promised to hand it to this repliant in a day or two, but which he never did until a considerable time in the last term, when this repliant expressed to him his wish that he would either give him his argument or return it to the judges, as he wras not willing that the judges should have Mr. Humphreys’ statement alone to deliberate on. ' Mr. Haggin handed it to tbia repliant shortly afterwards, without expressing a wish to again see it; nor was it supposed he wished it* see it again except to be assured that the expressions, excepted to were modified. For whirl) purpose this .repliant intended to again shew the paper to Mr. Haggin and for no other; but he went to Jessamine court, where he remained for some time, and this repliant handed the brief to the judges, without any alteration as ho beiieves in its meaning, and with but little change in its verbiage or wording-, On the first interview, he thinks, he liad with Mr. Haggin, lie informed him that he had returned the brief to the judges, am} here ended every thing that !\e recollects relating to the conduct of this repliant. He is sure he felt neither motive nor inclination to leave Mr. Haggin without a knowledge of what his brie: contained, and he certainly had as good a chance, after he had had possession "of the brief for six months, to reply to it, as this repliant had to regpond to Mr. Humphreys’ brie}' which he. never saw, spill never wishes or expects to see.
In answer to so much of the petition as attempts 9m argument of the ijucslipn, the deieudants cotusoe’i *471 is compelled to declare that after the most mature deliberction and thorough examination of it, which be feels himself capable of, he is unable to perceive any thing new or solid in the view attempted to be taken. The complainants counsel do not tempt to shew that they have equity, but they labor to prove that White has not. indeed they beg the question from the word, and having done so proceed accordingly. First, they take it as granted that a mere chose in action is the subject of grant by mortgage Without a delivery, and that a record of such deed is good. Now Williamson had but a chose in action, a parol or a bond contract on Saunders; could this be mortgaged and the bond be and remain with Saunders? Was the mortgage an assignment so that the mortgagee could sue at law in his own name? Surely not. By common law this bond could only be sued on by Williamson, and, by statute, it changes owners and thq right to sue, by assignment. And is every assignee, before he takes an assignment of a bond, note or bill, to see that there is no mortgage on it. Surely not. The only case recollected on this point is the case of Edwards and wife against J. Hughes and others, in the circuit court of the United States. Hughes having an equity to a lo.t in Lexington, mortgaged it to Mrs. Edwards, to secure a sum of money borrowed. This mortgage irn hided the house in which he lived and held in fee, and the lot of which lie had only ati equity, adjoined his residence. Hughes sold to Wilson, and Wilson procured the deed from the trustees of the town of Lexington. The mortgage was duly recorded and the only question in the case was, whether the mortgage was constructive notice to Wilson. The circuit court oi the United States for this district decided that it was not, and the decision has been affirmed in the Supreme court. 1 take it, therefore, that constructive notice is out of the question, and that my ('limits are purchasers without notice: not admitting that notice would bind them.
But the ingenuity must be admired with which the gentlemen get around the. questions presented in, 1 be cause by proving, by their own mode of reasoning, that White could not obtain the aid of a *472 court of equity to enforce a conveyance. This in certainly easier done than to prove what it behove them to prove, that iSi, that they have a right to the aid of a court of equity. If a man sell yon his land, worth ten thousand dollars for one dollar, if, would be very difficult for you to obtain a decree for a conveyance; but not half so difficult as it would be for him to obtain a decree for' a re-conveyance, if he liad, conveyed in consideration of one dollar.
The time of (lie court, w ill not be wasted in attempting to familiarize the rule, that the defendant-may hold until the complainant shews that he has a right in law and conscience to the interposition of a court of chancery. It is sufficiently laboured in theUrh-f, and the authorities refcred to are again submitted to the court. If a man promises you a gift, cannot compel a specific performance, but it' he give and you are possessed, it is yours in law and equity. Here lUiamson was morally and in honor bound to comply with the terms of the lottery; no law forb’rde his .doing so; under this moral sense betakes the 2,100 and makes the conveyance.'or causes it to he done; the contract is complete and neither Mr. Haggle nor Mr. Clay has ventured to suggest an opinion that Williamson could recover the land again. No, jn law, in conscience, in equity, it was forever gone, when made perfect in While-, by the deed, as to Williamson; and it will be shewn, if not already done, thathis assignee stands in no better condition. It has been before stated that the law did not make the lottery, as to the fortunate ticket holder, void, and ibis doctrine is expressly recognized by this court in the case of Hardin Gray against William Roberts, 2nd Marshall 209.
The gentlemen have likened it. to the case of securities Or titles obtained under gaming and usurious contracts; hut here they fail. These contracts are expressly declared to be void by the statutes relating to them; and it is said by Lord Coke, that securities, such as bonds &c. would be good and valid because they import a consideration, if the statute had not, with intent to prevent the particular mischiefs, not only prohibited the practice, but declared all bonds &c, void, It is mos* cbviousthat thelefor; *473 Sature did not inteiid to protect lottery ticket sellers, but ticket buyers. And it.only prevents a suit to recover the price of a ticket; but goes no further. This deed is not made to Williamson, nor by Williamson, but by Saunders who receives when he makes it $5000. It was not won from Saunders; but the consideration is adequate, and surely as to Saunders it is made on good-consideration — It is therefore valid. Suppose the case of a gentleman who wins money, and the loser pays, and he immediately buys land with the money, or suppose the loser pays money to the grantor; as to the grantor am! grantee, the deed is good. So if the gamester promises to pay a gaming debt to a third person who accept it in discharge- of a debt from the fortunate gambler, even this promise is good. These cases tend to-shew what is meant by void contracts-under the statutes quoted, and to illustrate by them that White’s deed under tfie lottery from Williamson might, be bad, yet when he derives under.Saunders, who has been paid for it, be has it on valuable consideration. He p?/id Williamson $100 only, but for this Williamson' assigns on Saunders his chose, in action, and that cbosfe is merged by Saunders’ deéd. it has been ali ready said Williamson might give White $5000 — It is not pleaded that sum belonged to the trustees. He' does do so, and buys the title from Saunders. Is there any thing dishonest in this? Any thing prejudicial tes t.he trust estate? It is not pretended that the land was in point of fact, worth $5000, and of course the mortgage or deed of trust was worth nothing, unless the complainants had shown that the land was bought with their money, which is not pretended.
I will now attempt to shew, by a very few additional remarks, that the complainants cannot have the interposition of a court of equity. The suit is in the name of Prentiss, but admitted to be for the benefit of Mr. Uaggtn; Mr. liaggin is now not only the attorney at law in this contest, but urges his interest as attorney, as a reason why the court should reconsider their opinion. Indeed lie-presses his claim in a tbre fold character; 1st, Prentiss is' a fair purchaser; 2nd, he is himself a fair.pnrcbaser; and last- >, hv permitting White to hold what he has, vnir *474 fake the property from the. creditors. That is, to get it from II hite. the property is Mr. Prentiss’. Mr. Hoggin’s, and belongs to the creditors. 1 will shew that it belongs to neither.
First, as to creditors. It is a matter well settled by our law, that mere choses in action, such as bonds or parol contracts for land, cannot be subjected t.a the claim of creditors eilher in law or equity. The old cases of Saunders and Allan, and of Buford and Buford, and of Thomas and Marshall settle this point. Then as no creditors could either at law or equity reach the claim of Williamson, he might as to creditors assign away the claim upon Saunders upon a good or void consideration, or give it away; and sure it is, no creditor can now by his bill touch.the property, no matter however fair his claim jnay he. 'J'lien can the complainant recover? i hat he cannot, I refer to the brief of the defendants. First, he claims under a deed of trust, fraudulent and void. I deny the right of a man to become bankrupt and at pleasure make his own bankrupt Jaw. The deed must not be made with intent to hinder creditors. If a man could create a trust at pleasure for all his creditors what becomes of your fi fa and ca sa laws? who would have one atom sold when by creating this general mortmain he might prevent every atom of his property from sale? If he cannot so convey his- property much less can lie make a general conveyance and point out his favorite creditors. I deny that such,a deed as the one in contest ever was held to be valid cither upon the principles.of the common law or under the statutes of Elizabeth. St is true that a man may sell to a’creditor, or mortgageTo a creditor, to pay his. debt and thereby give a preference; but it does not follow that he can sell his whole property or mortgage his .whole estate to one creditor, or a set of creditors, with intent to sacrifice, the balance of his creditors, nor with intent to hinder or delay them.
Can any man read this deed of trust and wink so hard as not to «sec, that if is made with intent to liinder'and delay creditors? in making this remark I wish to be understood as re-faring to the deed and the motive of its execution, inferable from its provisions,
*475 Mr. Williqmson was indebted, and Mr. Williamson was in posession of property, Mr. Williamson by law was a free agent, and made capable to bold or sell his own property! hut-tire"!aw made Mr. Williamson liable to suit, and execution followed jtidgment. He knows this, and so do his trustees;. What then is the shift? To convey his whole estate to trustees not liable at law, and clog the trust with divers stipulations and contingencies, to render redress in chancery tardy, if not impracticable, to the great delay of creditor, and so expensive as to beat-off the smalt ones altogether Is this permissible? if ibis, then the statute against fraudulent conveyances is a dead letter. The statute speaks of hindrance and delay &c. How long has every creditor been delayed? Nine years, and until Williamsons death, and.so far as the court know, not one creditor satisfied-, if de,eds of this kind are tohyated, will any debtor ever pay but-at his own will and pleasure? And will, not every debtor become a bankrupt in his ow.n. tunee and in. his own way? The counsel for the trustees state that the property is set forth, the debts are set forth, and all may see &c. See what? the deed of trust,,
I presume; for they do not pretend to say they themselves have ever seen the property or half of it.
Passing from this part of the petition. . It i.s per-, ceived that the counsel for the trust is labouring to prove that 1 he conduct of the trustees subsequent to. the trust cannot affect the trust. This argument is certainly more subtle than solid; A moments reflection will prove to the contrary., Á man may loose liis own estate fairly acquired, by bis conduct. As in the. case of Anderson and Kirkham, where Anderson, who bad fairly bought and paid for Garneti’s land, and had moreover a decree, for i title, advised his neighbour Kirkhgm to buy from Garnett’s agent; Kirkham bought and obtained the legal title and ejected Anderson, and this court refused relief to, Anderson, though his title was well .known to Kickham, and he resided on his place for years before, Kirkham’s purchase.
The case of Morrison, executor of Nicholas, refered to, is a strong case. There M wrison. an executor, by being present and witnessing the bon& *476 from Jordon, lost the title and the benefit of his contract with Scits as an executor, and as defendant, was compelled to convey. Hut here the party is complainant; whatever, therefore, shews that in conscience and moral equity the legal title ought not to be disturbed may be fairly alleged. Hence l contend that, the subsequent conduct of the trustees may be examined for the two fold purpose of shewing, first, i he intent with which the deed was made, and second, to prove that by the conduct of the trustees, and especially that one for whose use the decree is sought, lias been such as to forfeit all claim to the interposition of a court of equity.
Is the fact thai the. trustees never possessed themselves of the property, never kept any accounts of the sales of the persons»!, estate, that they constituted Williamson who had constituted then!,and never asked or called for an account, po evidence of the intent and meaning of this deed of trust? It is not enough that the deed shall be. fair on its face, it must be fair in fact, and every act of the trustees evinces the character of this transaction. They take care not to stipulate for each other, and lienee it is, that Hunt &c. seem to have no care about the estate. Can it be believed that such men would have in good earnest undertaken the liquidation and settlement of debts, to the enormous amount enumerated, mid thousands untold, of property scattered on the four quarters of the earth, and folded their arms and remained in listless apathy as they have done? Impossible. Now say what you will, tiiis was, in gentle terms, a mere accommodation trust. Those men no doubt would have scorned the idea of assisting Williamson to defraud Isis creditors. But they were willing to let him use their names to gain time, and I think [ speak the scntiments'of their hearts, when l say that they would have seen him banged before they would Siave undertaken the‘drudgery and toil of performing the deed qf trust according to its import. No they performed their, trust according'to the understanding of themselves and Williamson, when they acknowledged the deed, "If! not, why' did they not have dower relinquished. They aré content that ho shall sell, shall squander, shall lottery off the pro^t *477 erty. It is no affair of theirs. None of the trustees pretended ignorance of the lottery. January and Haggin are active in promoting of it; it progresses, and White succeeds in drawing a part of tiie property. obtains the title, settles upon the land by bis tenant; and then the trustees for the first lime move. They sell. To whom? To Prentiss, who does not pay a cent, but who sells his bid to Air. llaggin, a trustee; Mr. Haggin,as was before stated, pqys; Mr. llaggin the seller becomes buyer; asid a bill in equity is then brought by him, in the name of Prentiss, to wrest from White the legal title. And is itnotcompetent for White to say, not only that the deed of trust is fraudulent, but that the claim is now asserted by a person who does not entitle himself to die aid of a court of equity? The answer that only llaggin and January sanctioned the lottery, is entitled to no consideration; first, because it is not true in fact — their knowledge is charged; that it was also advertized by Worsley in his paper i,« also charged, and not denied. They stipulate for themselves. Haggin and January are found preventing Trotter from disclosing W illiamson’s situation, declaring if the lottery is stopt Williamson was ruined, offering; to assure Trotter’s debt; and, after all, Mr. Haggin becomes owner of the properly. The question is not what Hunt did, but. what has lie done who complains, Hi* has pushed the lottery, he has caused the property to be sold, has taken the bargain, and asks to have his sale consummated.
REJOINDER TO THE APPEXEANT’s ANSWER, JSY H. GRAY AND JAS. HAGGIN, E.‘,Q,S.
Arguments immeasurably extended must boas unprofitable as they are irksome. And one would think that the taste of no one would prompt him, in an answer to a petition for the rehearing of a suit, in chancery, to pour out the treasures of declamation, it is averred, in many a shape, by the adversary counsel, that one of the trustees is interested in this controversy. Were this au important consideration, (and that counsel seems at least to attach much cons'C *478 quence to it,) it would be sufficient to say, that fact does not judicially appear. What is the. proof? The answer of that defendant, which is no evidence against his co-defendants or the complainant, lint if by subsequent transactions, one ot the trustees has acquired the equity, which the creditors held, it is believed he may lawfully and conscientiously assert it.
White would now pass fora purchaser. So might every donee, technically speaking, anil every gambler who had acquired by his calling, the estate of his fellow-citizen. Rut he is certainly not a purchaser within the intent of the s'aluta of frauds, nor in the acceptation of the chancellor. He denounces fraud and grows infuriate against creditors in the cause of creditors. Yet ho has no merit hi/nself', and is not in a posture, to protect creditors. A1 re any creditors injured? JLet them com plain; but do not let White run away with the means of their redress. Have the trustees violated their duty 1 They stand amenable.-; to the law.
It is said that the purchaser under the trustees has not paid, — This is with the parties to the deed. Surely the creditors know the charge untrue. Nor will the assertion derive any countenance from White’s own cross hill — “The frustres are not bound for each other,” — Nor should they be. The law would not imply it. and the forms provide against it. Arc eye» executors mutually responsible?
It is contended that the record of this deed of trust, does not convoy notice. If it did, then nothing could protect White, not even his being purchaser fop a valuable consideration. Such a purchase. would be deemed male fule. Rut if it did not communicate- notice, still it vested an equity prior In point ot time, to any pretence of title- acquired by White; and one confident reliance is, his failure to give any equivalent, and the violation ofposithe Saw in the mode of his acquiring the title.
We acknowledge that the estate of Williamson in this land was not subject to execution; still this does not impair the equily'of creditors under the mortgage; though it might silence the cry for general creditors, Will the learned counsel on the othp?. *479 ’side, contest the ability of Williamson to make a valid engagement for the sale of his interest,’although he could not transfer the Segal tille? Such a sale, as that a subsequent purchaser, at the highest price,having notice, could nor hold? Or that he' mortgage or convey it in trust for the benefit of creditors? Although the law creates no lien, or such an interest, in favor of any creditor, doubtless the owner of it, by his own contract, may ere--ate it.
The creditors are now supposed to have notice of the lottery. More truly might ^this knowledge be imputed to White. But if they all knew it, what did they know? Of an illegal operation, which being forbidden by law, could be legalized neither by silence nor by express assent. But if assent could sanctify it, ought White not to have obtained or seen such written assent? It is now alleged that more of the trustees knew of and assented to it, The principle cannot be changed — the trustees are only agenta to a limited extent, and with qualified powers. The authorities cannot be mistaken. Trustees can bind in only one case otherwise than in conformity to the deed; and that is the case of a bonajide purchaser for valuable consideration.
The doctrine- that the chancellor will not always refuse to interfere for one when, touching the same transaction, he would not relieve the other party, is inapplicable. Even if he would not cancel the conveyance at the instance of Williamson, or relieve a general creditor, it does not follow that he will withhold his interposition in behalf of a prior specific lieu, to secure specified just debts.
The learned counsel inveighs against the deed of trust. A man must not make his own bankrupt law. And is this a bankrupt law? Is it not an abuse of language so to denominate it? The law might, if it pleased, restrain a doubtful debtor from all alienations of his property, even for the most honest purposes. But it has not done it. It has provided when the general lien of the creditor takes effect, and that is from the delivery of the execution to the officer. Up to that time, if has left tlie debtor free, honestly to dispose of his estate, it might interdict *480 all preferences* but it has not (lone it. It makes preferences itself — in cases of Ward’s estate, Ac, &o, &c. Nature makes preferences. Their basis ja sealed in every man’s heart, and their justice sanctioned by the unsophisticated feelings of every human bosom. Deeds of this description are believed to be countenanced in every state in the union, and in every civilized society.- There is no general condemnation of them. Each is judged by the peculiar circumstances which attend it, and pronounced valid or fraudulent accordingly.- The learned counsel, by admitting that a debtor may prefer one creditor, concedes the point Where is the limit? He would 'nevertheless, prevent all general conveyances fui- prefered creditors, and leave them al!, en masse, to rush into the courts and to run a rare for the first judgement and first execution; / And is he sure that the most meritorious would always win? Is he certain that, iipon his scheme of dispensing justice, even equity in the eiid would be administered? Even according to his plan, rnay not the debtor, by accelerating or retarding the recovery of judgments, secure in another way, those very preferences* Which the learned .counsel is so shocked at?
„ __ .? une 22.
Allegations of nnt°Tmcain" ihcmik’bill.
A re-hearing was granted, and the cause again argued before Judges Owsley and Mills. ’ But the court, on consideration, adhered to the former decision. To which effect—
Judge Mxt.i.s delivered the second onimon cf the court.
The bill of the complainant states that David Williamson (who is made a defendant,h purchased of ^ew's Saunders a tract of about i 80 acres of land, which Saunders was seized in fee, and paid the ptirchose-money, but did not obtain a conveyance,, except for a few acres thereof; that being indebted to the late Kentucky Insurance Company, the Bank of Kentucky, George Norton and others, on the 87(1) of December, 1814, to secure these debt», and indemnify his creditors and endorsers — he, Williamson, executed a deed cf conveyance to .Tolu *481 "W. Hunt, Thomas January, William W. WorSle.j% am! James Haggin,\pvho were also made defendants.) for this farm and some other estate in trust, authorizing them to make sale ,of the .property on such credit as might seem to them expedient, upon {he default of Williamson to uiake payment, ami the request of the creditors, as would appear by the <leed$ made part of the bill, aiid which is refered to for the description of the property, the objbet of the deed, the pro-requisites to á sale, and the mode of distribution, and which was recorded in the proper office and attended with much publicity; lliaf Williamson himself had dealt very extensively and was generally known in that .quarter..of the country; that* the defendant Williamson, failed to satisfy tlsc demands provided for by tiie deed, and the creditors* having long indulged him, at length by their written directions required the trusties to make sale, of the estate, and after much procrastination, by ins junction, 'on the part of Williamson, they finally published as required by the deed; and in all things conforming to its provisions, they exposed the estate to sale, when the complainant, Tims, G. Peers,fiss, became the purchaser of the aforementioned tract of laud, as would appear by . the certificate of the trustees filed with the bill; whereby, and by the terms of the sale, he was entitled, as he was advised, U> a conveyance, which it was the wish of the credfors and trustees should he immmedi.ately made to him.
But a certain Philip White, (who was also made defendant,) pretending to have won the same of Williamson, in some lottery or oilier gaming transaction, liad lately obtained the legal title from Hie said Saunders, and refused to canccl'the same or to fansfer it to the complainant, although fully notified of his purchase, and had been requested to convey or canee] — and although lie well knew the lottery or other transaction, by color of which be obtained title, and by which he held it, was unauthorised in law. illegal and void, and conferred no equity, bat was offensive and punishable by law — and although he knew that the pretended lottery or gamifcg tra-isaelion was set on foot after the execution *482 of (be deed of trust aforesaid, and his deed was per* fectcd with full notice of it — and that his deed was prepared with some pains to avoid the just rights of the creditors under the trust; and so conscious was he, 1 luu, he could not prevail in equity, he obtained possession of the land, and by his son and.servants committed great waste, and more especially since the purchase of the. complainant, and had engaged a certain John Payne (who is also made defendant,) to employ a number of hands to cut down timber and make sale of it, resolving to make profit of it while he. was suffered to retain it.
Prayer of the bill.
Affidavit on melien for injunction to stay waste.
Injunction.
Answers filed.
Substance of Williamson’s answer.
The hill concludes by praying a conveyance and possession of the laud, and an account for the waste rents and profits, and an injunction restraining waste, and is signed by James iiaggin, as counsel for complainant.
March 6, 1818, before a circuit judge, the following affidavit was made on the bill:
“This day James Haggin made oath before the undersigned, that the .defendant Fay no informed him of" his determination to cut down and sell the timber on the land, in controversy and that he was privy to (lie circumstances relative to the'deed of trust and purchase by the complainant, and believes the allegations of the bill true.”
On (he 8th of the same month an injunction to stay waste was awarded by the judge. An injunction bond was entered into, with John T. Mason security, and on the 26th of April a subposna with injunction issued,
August 10th, 1018. The defendants Williamson, Hunt. January, Worsley and Iiaggin filed their answers.
Williamson admits the deed of trust, the sale by the trustors, the purchase of complainant, and states that, with a hope of redeeming himself from embarrassments, and paving his just debts, he did, af ter the execution of the deed of trust, resolve- on a lottery scheme fo> the distribution of property, confident that the purchasers of tickets would with due promptitude, pay the amount, and tints enable, him to redeem the property and convey to those who drew prizes, and ho believed his purpo¿o and con *483 úition of his property was generally known to the purchasers of tickets — that the defendant White held a ticket, at the price of one hundred dollars, and drew as a prize the tract of land in the bill mentioned, which was bought from Lewis but for which be himself had not received a deed or paid all tiic price to Saunders — that he settled the-balance of the money,' and requested Saunders to convey to White, which was done — that to his great mortification he proved unsuccessful in collecting. Payment was refused in many instances, because of the illegality of the measure, and consequently the creditors required, and the trustees made sale of the land.
Answer of tha, trustees.
Answer of white’s ten» ant.
White’s oriSinal answor*
This answer w'as sworn to in the usual form.
The answer of Hunt, January, Worsley and Haggin admits the deed of trust to them, the failure of Williamson to satisfy the demands provided for by the deed, tiie order of the creditors to sell, the injunction of Williamson, the sale ami purchase of Prentiss, and that they wore satisfied the title should be made to him; for they were informed and believed that subsequent to the deed of trust, which was a matter of much publicity, the defendant White had obtained a deed for the same land from Lewis Saunders. This answer is neither signed or sworn to, nor is.any objection made to it fry the complainant.
The answer of Payne, who appears to he only the tenant’of White, denies the commission of waste in the manner charged in the bill, and waives going into the controversy as to title, and his answer appears to be, as to this controversy, unimportant.
August 8, 1818, the defendant White answered, and requires proof of the deed of trust, admits a schetuej.br a lottery by Williamson to distribute his estate, that he, White, purchased a ticket therein at the price of one hundred dollars actually paid, and drew the tract of land in contest, and about two months afterwards received a conveyance Irom Saunders by direction of Williamson; and also possession of tho land, which he took, not from the mo-fives charged to him by the complainant, but believing it to be his own, and denies that he wasted. *484 (,'r l¡se(j the land improperly. He requires prod^ .that the, trustees executed a sale to Prentiss
WlliTe nr complainants equity.
fie contends that the deed'of trust is fraudulent: and void'ás to creditors and purchasers, because it was calculated to delay, binder and defraud them — - A»d he denies any 'notice thereof until long after he hail paid for his ticket and received a conveyance for, and possession'of the land. And charges that about g5000 of the purchase money was raised by Williamson of the proceeds arising from the sales of tickets in the lottery, and paid to Saunders before he- conveyed the estate.
He insists that the trustees and most of the, creditors encouraged, aided and consented to the lottery, purchased tickets,' and' advised others to purchase; and although the trustees resided in Lexington whore Williamson resided, atid the lottery was drawn, and alt hough Haggin, one of (lie trustees, Was a lawyer, learned in the laws' and statutes, ye.fc the trustees and creditors, many of them were present at the, drawing, and never intimated an objection to the same, but. held out to the. people, tiiat the scheme was lawful and right, 'and appealed to the liberality of the public to support it; and that Wors]cy, one of tho trustees, was the editor'of a newspaper, and published therein the scheme assuring the public tlsat tilles Vould be, made to th'c drawers of prizes; tlsat after the drawing of Ihe lottery, January offered to purchase tho land of’him, dnd Haggin actually made a conditional contract for it, without suggesting a doubt, of the, title; and that Hag-gin bad offered to 'relinquish the purchase for one half the laud; that these'trustees and creditors smiled on (tic lottery until they enabled Williamson to eollect from, the unsuspecting purchasers of ticketsj from' twenty to fifty thousand dollars, and after-' wards combining with the complainant and others, purchasers of tickets, proceeded, as he was told, to sell the estate; which sale lie was ach ised, was illegal, fraudulent and void, and was' not -made according to the deed. And he contends that he is in (he a!ti-’ iude of a fair purchaser for a valuable consideration, Without notice.
White’s first an~ cross liii&wkey; charging the thlVcrcfiroC Haggiii amt ! requiring his a”d. 00ai' .^vcrT11 S an’
Prentiss iaik V? answer, fv revived in the name q? ius iu"W-
He further charges that the suit, though in the «ame of Prentiss is for the benefit of Haggin as to the whole or part of the land in contest, and makes Haggin a defendant, in Ills’ answer in the nature of a cross .bill, and requires him to answer these gations as respects himself.
February 1, 1819, White filed an amended answer, in which ho charges that Thomas G. Prentiss, the pretended complainant, had absconded ami left the state, and as be, White, believed had little or no interest in the suit, but it was carried on for tiio benefit of Haggin and perhaps others unknown. And he makes his answer a cross bill against both Prentiss and Haggin, and requires their answer — -He insists that Haggin is the party materially interested, and was interested by an understanding or agreement between him and Prentiss at the time of the pretended sale, and that understanding or agreement was either verbal or reduced to writing and he requires its production. And he propounds nunierous interrogations, in almost every imaginable form, to extract either from Haggin or Prentiss the nature of HaggiiPs interest as well as that of Frentiss, and when or how'the contract was between them." He d'enies that either Prentiss or Haggin had paid any thing for the estate; and insists mat the ¿ale was colorable, and intimates that-James Prentiss or others were interested in the purchase, and requires by divers-interrogatories a disclo“ure on this point. He requires an explicit answer whether this suit is not carried on without th< knowledge or consent of T. G. Prentiss, and was not tin* bill, and every paper filed in the suit written by Hag-gin, and did he intend to let Prentiss have any benefit from the controversy. A nd lie requires a discovery of every one interested in the management or proceeds of the suit, arid requires Prentiss to disclose whether he ever advised the suit or knew of its existence. '
To these charges and interrogatories of White, the complainant never answered; but - on the 6th of March, 1822, Ills death is suggested on the record, and an order made reviving Hie sub in the names of certain persons as heft’s, without stating them infants.
Answer of the cJar'jaínants ííeírsYo cross bill.
Ifagrin’s ansiverto White’s cross
At the February term, 1822, on the motion of White, Joseph Towier was appointed guardian ad litem, to defend and answer the answer of White in the nature of a cross bilí, for the heirs of T. G. Prentiss, who are said to be infants.
Qir t|10 goth of the same mouth, that guardian answers for the heirs, that “they have no knowiedge touching the matters propounded in White’s answer, by way of interrogatory, and therefore, cannot admit, but must expect foil proof thereof as far an deemed materia!.”
At the same time Hoggin answered, “that Williamson had been a number of years engaged in ^}jc|)0jasv¡ne and Lexington, merchandizing, rope-making am! exporting produce, and becoming embarrassed in his pecuniary circumstances, at there-quest of his creditors and endorsers, and for their indernnity, executed the deed of trust or assignment set out in the bill. His failure being, one of the first and greatest produced by tiie late disastrous times in that quarter, the assignment or conveyance of his estate, soon acquired, as was believed, very great publicity. The deed of trust was made and .soon recorded. Sales wore several times published by the trustees and again suspended, in conformity to the orders of creditors. That he considered Williamson liad many friends who purchased tickets in the lottery, and acted under the influence of a desire to relieve him from his difliculties, and a reliance upon his persona! exertions to indemnify them, and they were not supposed ignorant of -his condition, and the iucmnberances upon his property, and therefore, alUm’ apprized of the lottery, and in town while it was drawing, he (Haggin) did not deem it necessary to interfere. lie did not believe lie was-present at the drawing, nor did he purchase a ticket. .But at tbattime he would not have feared to give Williamson credit for the'price ofse.voral. indeed, jie, afterwards became Williamson’s security to the amount of about seven hundred dollars, which lie was compelled to pay. Ho did not believe that Williamson was paid with any punctuality by those Who purchased tickets in his lottery, not even by this.ydendar.t White, and Williamson resorting tola"/ *487 to recover the price of his tickets, the courts decided against him, and he failed.
He (Haggin) disavowed any encouragement to the lottery, but admits that on his way to the court house, about the time the drawing was to he witnessed an unpleasant altercation between Mr. Trotter and Williamson, which, as a mutual friend, he endeavored to suppress. Trotter threatened a publication, by handbill, which Williamson considered hostile, aful which lie seemed determined to resent accordingly. Trotter’s ostensible object, was the communication (if a lien which be professed to hold on a house and lot in the scheme, for a lottery, and he (ilaggin) supposing the condition of-the title such, and so well known, that Trotter’s rigid could not he impaired, and really suspecting Trotter’s object was an attack upon Williamson’s feelings, to extort from him a payment, even more than due, lie interposed, not supposing that Trotter’s publication would produce any effect upon the lottery.
The tickets trad been sold and the tacts were presumed to be known. Williamson’» credit- was not: gone, and mos't who essayed in the measure, hoped the proceeds would redeem Williamson, and secure to them the prizes.
These efforts failing to raise money, the trustees were required to sell The trustees were’slow to interfere, and were for a while enjoined. At length the court dissolved the injunction, under circumstances indicating it as a duly with the trustees to make a sale. They accordingly advertised. Williamson had drawn most «{'the valuable, prizes himself, and most of the others were of little moment. That it occurred to him, tlie defendant Hag-gin, (hat an adjustment of every difficulty might be effected by the. presence, of the few who had" been fortunate, and he took therefore, some pains, that the. defendant White, should have notice, and sent him a request to be there. His son came, before the. sale, and he, ilaggin. went with him to the complainant, Prentiss, who had the supcrintendance of the largest debts, and perhaps to others, with a sincere desire that a compromise should be effected. He v>as aware, that as doubts were entertained as to the tit!o *488 Of the property, it might sell at a sacrifice. The son of W hite then represented himself as authorized to sell, and proposed selling to him (Kaggin,) and likewise, to engage him on a very liberal contingent fee. He then told the son, he would give him one of two lots then shewn, for his claim, with ah expectation of suppressing further controversy; for he did not doubt the creditors would compensate him.— But he .was not disposed to make any engagements as an attorney, until the sale was over. .At the sale the son bid; but Thomas CC Prentiss offered more», and became the purchaser.
For whom Prentiss purchased, except for himself, he (flaggin) had no knowledge. For he expressly denied that he had any communication with him, directly or indirectly, or any understanding, or any intimation at any time before the sale, on the subject of a participation in the sale. Indeed, he considered Prentiss .and his counsel, too much dissatisfied with him (flaggin) for deferring the sale so long. He did not believe or admit, that the deed of irust was fraudulent, on the contrary, he knew it was required by the principal creditors, and believes it was made with an intention to secure to the creditors, as far as in his power,‘their just demands.
He cannot admit that ho offered (tie defendant, White, sixteen thousand dollars for the tract of lam! in contest, at a time when it, was hoped that Williamson would be able to satisfy his trust creditors, and still succeed in business'. Hesays written proposals for a purchase did pass between him and White-, and lie believed that White, yet detained his letter containing them ; for he, White, acknowledged not. long since, that he held it, and was requested to preserve it; but he'did not expect it would ever lie-produced, because his proposal, ai he believes, feSJ greatly short of fhai sum — nor does lie doubt that, his proposal was predicated upon the idea of a warranty of the title by White That he often conversed with White on the subject, he believed before the conveyance was made, he is confident it was before the price of the ticket was paid, and nothing uhort of a positive denial could cause him to doubt *489 ihát he was apprized of the deed of trust as early ,ás their first interview.
He admits that several -of the papers filed in the suit, are in his hand-writing — some appeared to be written by White’s counsel, and some by others, and why the interrogatory on t hat subject, lie could not understand. He was sure the counsel of White knew the hand-writing, aiid thaf it was known to the court,[and would not be disguised or denied.'
He repeats his denial of the slightest interest at the sale to Prentiss, aiul acknowledges that he after-wards undertook to prosecute the claim of Prentiss apon terms and contingencies which he was hot disposed to slate, atid lie presumed it would not be required. That for the notes of Prentiss, on which he, Maggin, and John T. Mason, were endorsers, to an amount exceeding seven thousand dollars, more probably nine, he made an agreement with Mason to pay him a sum exceeding three thousand dollars, lie thinks upwards of thirty-five hundred, and gave up all demands on the mites lifted as aforesaid, for the interest of Prentiss in all his purchase, except one fiotise and lot. For. ihal contract he had particularly examined on that morning, -.'when he drew the answer) and .could not find it, and therefore, presumed it to be in the possession óf Mason. That he was not able to speak very definitely, either as to the, amount of (lie notes paid, or the «urn's paid on them. For, several years had since elapsed, without any motive for hearing it in mind; Mason paid a part of the notes; but he, Haggin, was strongly impressed, that the sums were not exaggerated. The purchase of Prentiss exclusive of the house and lot, included another tract of one hundred acres, adjoining the one in contest,claimed by others, under the lottery as aforesaid — another house and lot and some small pieces of property of no great value,.
He further stated that he might be mistaken, but ho believed the full amount of Prentiss’ purchase .had been paid to the creditors, and the obligations cancelled accordingly. He denied that he ever offered to release, or convey to White, for one half, or upon any other terms, previous to the sale to Prentiss; nor did he believe that he ever offered it: and *490 although previons and subsequent conversations had taken place on the subject of compromise, and he believed that proposals had since been made, but not such as alleged in the answer of White.
White’s second amended answer & cross bill.
He further states that this suit was instituted more immediately under the direction of James Prentiss, whom he believed to be an authorized agent. That he did not know .who were aiders and abettors with Prentiss, or what interest James Prentiss had in the purchase. The aiders of himself were the trustees, or some of them, and he knew no terms with Thomas, James, or any other person for them.
On the 27th of February, 1822, the defendant. White, tendered another amended answer, which was objected to; but leave to file it was granted. It gives the following relation:
That he purchased the ticket in the lottery without knowing that he violated any law, and with a view to enable Williamson to pay his debts.
The charge of fraud in the deed of trust is repeated. That Williamson was largely indebted to others besides those named in the deed, and the deed was bad and contrived to hinder and delay his creditors in their remedies against him, and the statement in the deed as made between the trustees and creditors, was a mere shift and devise, to give color to the transaction, and such creditors were no parties to the deed, and very few, if any, were consulted or gave their consent, and if any did, they were induced to do so, under the unjust and unlawful preferences attempted to be. given them in the deed.
That Williamson was, by the trustees, permited to hold, and enjoy the property, and sell and disposeof it as his own, and the trustees never did take possession of, or sell any of the personal estate at. Orleans, at Augusta (Go.) and other places described in the deed; but permited Williamson to sell and dispose of it as his own, and not one cent of the proceeds had ever been applied by the trustees, to the payment of his debts; but so long as the whole property was useful and convenient to Williamson, they permited him to remain the sole proprietor and disposer of it, not only by lottery and *491 otherwise, but to apply it to the support of his family expenses, and his own extravagant and dissipated habits of life.
That not until he had raised large sums throughout the state, by sales of tickets to innocent purchasers, in what his advisers called a. scheme fop the distribution of property, and his delayed and defrauded creditors pressed him with judgments and executions, did the trustees take upon themselv.es to interfere with the property, and then, so far only as. is hereafter detailed.
That they then only pretended to sell the lands* and the whole was purchased by Prentiss, and was now claimed by Haggin, except one house and lot on Poplar row, and that held by favorites, who drew it in the lottery, and then gave a small colorable sum. to the trustees.
That the real estate contracted for by Haggin, would at the date of the deed of trust, have commanded between thirty and forty thousand dollars, and the persona! estate perhaps double that sum, had it not been drawn or covered from the creditors»
That not one fair and bonajide creditor haddbeem. paid by the trustees out of the estate.
That at a time when the late Kentucky Insurance Company, was in existence, and before its insolvency, Williamson became its debtor, and Thomas GL Prentiss and James Prentiss were reputed general partners in estate in Lexington, and James contrived, in the names of certain individuals, to gain a majority of votes in that bank, by which he ultimately got the entire control of it, and caused the-said Thomas, his brother and partner* to be made president.
That during his presidency, notes on the bank to an enormous amount, were issued — an old box containing some thirty thousand dollars of notes taken in and laid by., under-a. former board of directors, was broken open and- re-issued. The bills receivable were delivered to said James- by said Thomas, and assigned and sold by James for his own use*, and- that of said Thomas.
That after these mal-pract[ces,w-ere carried on*. 3,aid Thomas took upon himself to act for the co® *492 pany, and became the purchaser of the property in contest; and shortly after he maje the purchase, at the pretended sale, made by fiaggin and others— these fraudulent transactions through this bank, by failure, and the immense amount of notes out, and the cash in its vault disappearing, ami other facts, became public,and the said James made his flight by land to the East; and the said Thomas took water, descended the Mississippi, and never again returned, having died, leaving children, who knew nothing of this suit. That since, the bspik was dissolved. and even the hooks were ip-accessible; that notes of that bank fell to ten cents in the dollar, and many thousands remained unpaid that would not command even that sum.
fntoivogatotviiiie'io Haggin,See. °
ThaMhe whole payment, or the greater pari thereof, ¡{'any liad been made by Maggin, had been made in the notes of tiiat bank, at their nomina! amount of mere nominal value, and acquired by hint since the flight of the two brothers named Prentiss, find the insolvency of the bank, for none of which could lie have given'more than twenty-five cents its the dollar.
Tiiat neither Haggin or any of the other trustees, bad paid, any other creditor-one dollar, on account ofllicsé pretended sales, except in lnsa.rm>re notes. In fact, they had not settled and adjusted a debt of Williamson, except that Ilaggin may have used some of its notes to balance accounts with it,, after he knew it was dissolved, and after he knew that its president and his partner in this Insurance drama had eloped; all which charges vyere well known to all (he trustees.
lie then makes these charges a cross bill, and annexes the following interrogatories:
' Had they paid any creditor of Williamson? If so, Í0 "'horn, and when, and in what: - Did they takq possession of, or make sale of Williamson's estate. until after his letter}, and until lie was pressed by judgments and executions? Did they not permit, him to use and dispose of the personal estate, and did they not know, that he had sold and made away with it? ff not, what bad become of it? Bid they snake any exertions to get.possessiou of the proper *493 ,iy, and if so, when, and what exertions did they spake? What debts did Haggia ever pay for the estate he claimed under T. Gr. Prentiss? In what, and when, did he pay?' Were the rest of the trustees consulted, and did they severally agree to. these payments? To say by several and distinct answers — did the rest consent that Haggin should become the paymaster for Prentiss, and did the rest surrender or cancel Prentiss’ notes, or had they been consulted on the subject? Were there not creditors to a great number and amqunt, to whom they had not paid a farthing? Had they any idea of the amount of Williamson’s debts'? If so, state what it is. Had they any written consent of the creditors to the conveyance to them? If so, to state from whom, and ftie it. Did they not know that Williamson offered the land in contest for sale by the lottery? Did they not all reside in the town where the Lottery was drawn, and did they ever express their disapprobation thereof? And if so, to whom? Did not they severally, and especially January and Williamson, as much as in them iay, try to dispose of his tickets and complete liis lottery?
January, one, oflh" trustees — bis an, swerio White’s second amended cross, bill?,
On the 17th of December, 1822, January filed his answer to the interrogatories, and several cross bills of White — -as follows:
That he had undertaken the trust, and did not find it convenient to pay to it that minute and close attention which was requisite on the part of the other trustees, and had generally prevailed on others to attend to the details, still umti-g with them in its principal duties- He had, therefore, no knowledge on the subject of the accounts, which would enable, him to state what sums bat! been collected, and to whom paid, or by whom detained, and referred this to his co-defendants. That he had certainly at ted fngood faith in relation to the creditors, and considered the other trustees governed by the same motives.
rise object of the deed was to secure just creditors, and he believed the ohjeef of ail concerned was the same, and none intended a fraud upon any.
He knew very lit tie of the tlehis of W illiamson, except those named in the decdj nor did he know *494 that Williamson misapplied the trust estate to the use of himself and family. Under the. direction and authority of the trustees, Williamson went to Natchez and Orleans, and in other respects co-operated with the trustees,* hut he had not understood that "Williamson had perverted the proceeds, and he still believed him faithful, and supposed that he paid the trustees the amount of the means in his charge.
"Huai's answer to the jame-.
He did not intend that’ either Williamson or the sheriff should dispose of the estate conveyed in trust, otherwise than according to the deed, and he did not recollect a levy by an officer.
In relation to the lottery, he heard some altercation between Williamson and Trotter, and as their mutual friend, endeavored to reconcile the parties, and not to sanction the lottery. And he did not suppose it necessary that the trustees should say or do any thing on the subject. ’ The deed was of record, and he supposed known; and he considered the purchasers of tickets as contributing to the relief of Williamson, relying on his exertions to redeem himself and his estate from the deed, and he felt no interest in the matter.
He admitted the sale to Prentiss, and that he paid a part to the Insurance Company, which was. a large creditor of Prentiss; but the sum paid, to. whom paid, or in what, he could not say. He knew of no fraud in the transaction, and denied that any was chargeable to him: Nor did he know how the house and lot on poplar row, which Haggin did not claim, was held; and he admits the utter failure of the Insurance Company-
On the 17th of February, 1323, Hunt files his next answer, in which he repeats that Williamson bad been largely engaged in trade, particularly it; the purchase and exportation of produce, and proving ultimately much embarrassed, and being about to make an assignment for the benefit of creditors, he, Hunt, assented to become one of the trustees, and the deed was accordingly executed. That as far as relates to himself the transaction was fair and bona fide; for ho intended to satisfy just creditors, and not defraud any. He knows many of the creditors were consulted before the measure was a-. *495 dopted, and lie understood them to desiré it, otherwise he would not have participated. He cannot state who were, or were not present, at the execution of the deed; but believes most, if not ail, of them were there. Having matters of his own commanding most of his time, lie submitted the duties to one or more of his co-tnisiees, never having received any of the effects, nor kept any account, although he was frequently, and he believes generally consulted and acquiesced in every important measure. He believes the deed of trust was soon recorded after its execution.
"Williamson was soon dispatched to Orleans, as the agent of the trustees, to superintend the settlement of his concerns in that quarter; but he believes the result was very unfortunate; his shipments (conveyed by the deed,) producing very little; yet he must leave it to his co-defendant, Haggin, to shew the precise state of these funds. He never did understand that Williamson had applied any portion of them to his own use.
He denies any interest or agency in the lottery. He did know of it; but the deed of trust being recorded, the failure and consequent assignment of Williamson being a matter of considerable notoriety, and the publication of intended sales by the trustees, preceding the lottery, rendered it unnecessary in his mind to say or do more.
Touching the sale to Prentiss, he admits it, but cannot say any thing which he deems material. He presumes his co-defendants, Worsley and Haggin, could’ best show the payments were made, if important in this cause. The Insurance Company was a very large creditor of Williamson, as would appear by the deed, and in what it was paid, he did not know, nor could he suppose it to be material to the trustees. He has reason- to believe that institution was improperly dosed, and knows its paper depreciated, and that Thomas G. Prentiss was its president, The period or rates of depreciation be could not specify, .That he himself suffered a heavy loss by Williamson, believing in the fairness of the deed of trust. He did not know what arrangements were made with the house on poplar row.
W -rsley and H.^-gin’s , mint answer.
On the same day, the defendants, Worsley and liaggin. filed a joint answer, to which Raggin made oath and Worsley did not. They state that Williamson having proved unfortunate in trade, convened most of his creditors, and all known to these defendants, and within a convenient distance, and made to the trustees the conveyance of the estate therein expressed, with the-united consent and desire of the creditors, as they believe; and hclievii g the measure to be done in good faith to secure his creditors, by Williamsonf hnd that the creditors so desired, ^hey undertook the duties of trustees or assignees, as set forth in that instrument. So far as they know or believe, the deed was executed for the just purpose to secure creditors, and not with an intent to defraud, delay or hinder creditors or others.
They admit that Williamson was largely indebted; but do not admit that, his debts were considerable, exclusive of those provided for by the deed.
They do not admit that they permitted Williamson to use the property, as bis own, or for the support: of himself and family. On the contrary, although he liad an agency in the sales of much of the properly, they had the superintendence, and have, no doubt, the whole amount of the effects sold by him, was applied in satisfaction of the debts provided let by the deed óf trust.
They state that, immediately after the execution of the deed, understanding that the effects at Orleans Required immediate attention, and confiding in the integrity of Williamson, they, with the other tros fees, appointed him their agent, and dispatched him to that quarter, giving notice to those who liad his property in charge, of the assignment; and tbey were very certain that Vtilliamson acted, avowedly,, under the authority derived from them, and in no instance had tiiey reason to believe did lie assume an independent control of the effects, at Augusta, at Natchez or Orleans. Oe received but little, which he remitted, and in the summer returned, leaving his matters there in a very embarrassed condition, the produce yielding buf iiltle. it was chiefly in the hands of Duncan & M’Call. with whom they had never been able to effect a settlement; uno *497 of whom was said; long since to be dead; and for many years past a suit against them had boon depending on the part of tire trustees, and how it might terminate tliey did not know, nor did they presume it to be material to White, or his representatives.
They do not admit the right of White to call them to account, for the distribution of tiie effects conveyed to them for the creditors. They considered the property conveyed to secure creditors, and, therefore, did not take upon, themselves greater trouble and attention to it, than they supposed would conduce to that end; consequently, while the creditors were willing, and the property seemed secure in the hands of Williamson, they did not interfere. But they could not have felt themselves justified to permit Williamson, or tbe officdr, to sell for other purposes.
It was not'true that they exercised ho control until creditors levied, nor do they recollect any attempt on the part of the creditors to levy upon this property. They were required by the creditors, or. some of them, to sell in the spring, after the date of the deed; and tliey advertised, but the sale Was postponed by the request of the creditors. .It was a secomí time advertised and deferred. The publicity attending the failure of Williamson, who did a very, extensive business, the recording of the deed of trust, the frequency with which the subject wa§ mentioned wherever he was known,,an,d the several advertisements in the newspapers, left no doubt with them, that all, by any means conversant with Williamson, were, apprized of the conveyance and assignment to them. That although they were apprized of tiie lottery; they did not suppose-those who purchased tickets were ignorant of the previous deed; nor that it was necessary for them, in justice, to give any notice. Indeed they were not apprized how they would or should have given notice.
They were at length compelled to sell, in pursuance of tiie deed, and Prentiss became the purchaser of the real estate, by no means equal to the satisfaction of the debts provided for by the deed. What contracts lie. made with others, they, except Haggin, *498 only knew from report, and Haggin referred to bis former answer upon that subject.
They believed large sums had been- paid, and a part in Insurance notes; but they (relieved, that, at the time-of the sale and payment, those notes were Very valuable, although somewhat doubted at first, and ultimately of very little worth. The Insurance Company was a large creditor, ami they do not suppose it is expected of them to render an account of "all the creditors proceeds and payments, provided for, collected and paid over, and .as it would be a troublesome task, they then decline it.
That the sale'to Prentiss was not on their part, ''so far as they know or believe, a pretence, huta fair and bona fule transaction.
That they understood that William T. Barry held live Wtóé, bn poplar row, by purchase from Prentiss, and sid'd 'it to the Bank of the United States, and that Haggin claimed a considerable portion of the residue of the real estate, having paid for Prentiss and for Mason, and assumed to pay the purchase money, and about tjie sum of three thousand five hundred dollars above it. Of these facts, however, Worsley did not speak positively. That they do'not believe that the real estate, (responsible as the town property was for the purchase money,) worth half the sum mentioned by White, nor that the personalty commanded half that amount.
Touching the concerns of the insurance company, of which Thomas G- Prentiss was for a while the president, and iii which James Prentiss was said to have great negotiations, they alledged they were not able to render any satisfactory account,, They knew that if subsequently failed, yet they had 510 doubt the demand against Williamson was just, and the sale and purchase fair. They could not admit that the institution was dissolved, when Hag-gin made the payments. They, except Haggin, desired the funds received by him to be paid over agreeably to the terms of the deed of trust, and the pro ceeds from the sale of the lands to be applied accordingly; and the defendant Haggin said that he paid, as he believed, in conformity thereto the full amount of Prentiss’ purchase. That the notes were *499 leit with Worsley, and given up when payments were perfected.. That the creditors were not all satisfied. That they did know of the lottery and took no measure ta ratify or suppress it, for the reasons already given, and: really believed, the chasers of tickets to purchase with a knowledge of the deed and with a. reliance on the exertions of Williamson to remove the incumbrances.
Exceptions tés l^hite^n terro?atories~ in his cross hei^co^ C0X'
fa?= ther answer,
At the February term, 183:3, the- heirs of White excepted to these answers of January, Worsley, Hunt and Haggin, by numerous- exceptions, which are not necessary to be recited; suffice it to.say, that the exceptions were, that the answers were not explicit in response to the interrogatories of White, and had omitted to answer many of them altogether. The court sustained these exceptions, determined these answers insufficient, and dissected, them all to answer over. . •
None of them made further answer, except Hag-gin, who, on the'2d July, 1823, filed an amended answer, wherein he states, that it is true this suit is prosecuted for his benefit, and he had again made search for his contract, but could not find it, and he therefore, believed it in possession of Mason. That he could not s.et forth with precision,- the amount in. specie, which the estate of Williamson, purchased, by Prentiss, and ultimately by himself, had cost him. That he believed he had paid the nominal amount,, but chiefly to-the insurance Company, that institution being entitled t6 it by the. deed.of trust, -and in the notes of the. institution,, a part of which were. furnished by Mason — a part hp, Haggin, purchased, at par upon credit. — the residue he obtained at a discount, hot less than thirty-three,.noj; move than sixty-six, and the proportions of paper, which he purchased at either rate, except that which.he. bought-, at par, he had no means by which he could ..-give, any, thing like a definite statement. The amount; he-bought at par, he believes was about two thousand..: dollars, and the whole cost to him, he thinks, may bc-. fairly computed at nine thousand dollars.
He still protests against the right of W hite orhis^ representatives, to call him to account for the trust estate, or its proceeds, therefore,, he would not at* *500 tempt a detailed account, nor did he presume is would be required. He would, however, say, that many of the debts liad been entirely satisfied, -and partial payments had been made of others. That he did not believe the payments mado upon the demands specified in the deed, and of the avails of the effects embraced by that instrument, would fall.short of twenty-five thousand dollars; yet, he had no doubt that some of the creditors remained without the first'cent; for the demands were not of equal dignity, as would be seen by the deed of (rust
This respondent did not lay his band upon the effects conveyed by the deed; hut the trustees immediately assumed a superinlendance and control. Williamson, acted in the settlement of accounts, and in the collection of the duos, and in the sale of the effects under the direction ofvthe. trustees. The payments were chiefly made, likewise, so far as made, through Williamson, and under the. direction ofthe trustees, and the application of the trust effects to the use of himself and family; were not admitted. But, that on tlie contrary he believed, that he applied agreeably to the provisions of the deed, the' full amount of his receipts. That ho could not say what was the conversation between him and the co-trustees, on the subject of his paying the ansountof Prentiss’ debt, for the purchase of the property sold in virtue of the deed. He presumed they were apprized of it, and could not yet doubt that it met their approbation, the payment corresponding with the provisions of the deed.
But he hoped it would'be recollected, that it was ‡. considerable time since the transaction took place, and he was incapable of a distinct recollection of consultations and conversations about a matter which ho never supposed important.’' Williamson’s debts of the first grade were paid, and but one sentiment he supposed, could be entertained touching its propriety.
That he had no doubt that the trustees, or some of them, did consent, to the cancelment of Prentiss’ notes upon the payment of their amount, iipon the debt due the institution by Williamson; for he though]! they were once in the charge of Woivle*. *501 That it still seemed to be their duty to surrender them upon these terms, and he could see no motive they bad to object. That he had never attempted the computation of the debts of Williamson, except those specified in the deed of trust, nor did he pose his knowledge touching such debts, would be of service to White’s representatives, b'qt he did not consider them heavy. That he did not recollect that any of the creditors manifested-their assent to the deed by writing, at the time of its execution. But he believed most of them expressed it orally. That lie had no memorandum of the meeting of the creditors, upon the execution of the deed, but could say that he was impressed that most of them convened.
r,ro-°N
He then named about five or six of thq creditors secured by the-deed, whom he recollected as convening at that time.
The foregoing is a full abstract of the pleadings. The evidence has been noticed in the opinion already delivered, or in that which follows, except one or two facts, which will be added. It is shewn that sundry proposals passed between White and Haggin, with regard to this estate, before this suit was brought, in all of which Haggin acted as the owner of the estate.
One witness deposed, that Prentiss informed him on the day of sale, that he had purchased for the insurance Company, and Haggin he thinks, was present.
Col. Richard Taylor deposed, that he was chosen, and acted as a manager of the lottery; and thinks, but is not certain, that Worsley and January were present at the drawing, and did not forbid the drawing. .That he heard nothing said or spoken of that day, about any deed of trust or lien on tbe.estate set up as prizes, nor had he any idea of any The drawing took place in Lexington, where all the trus? tees resided.
VYe have been more minute in reciting the pleadings in the cause, in order that its features may b&. fully understood, especially as the zealous and learn? ed counsel .concerned, has earnestly, but respectfully urged upon the court, a full review of its features, *502 and has insisted that the first decree is based upon mistaken principles, or a mistake of the facts.
History of the •case in this court.
He-henrine; — . Praotice in this court.
Uronnds relied on by White’s heirs
Few causes have cost the court more labor and research, or have occupied a greater share of its deliberations. Indeed, it has been.a cause of aprivilodged character, it was heard at first out of turn» on written arguments only, and, the decree pronounced.
In answer to a petition for a re-hearing, the. prayer thereof was granted; It was argued a second time, arid the first decree approved. But a third argument was applied for, and because the appellees were not heard on the second argument, owing to singular and extraordinary reasons, and circumstances, not necessary to he related, tbe last opinion affirming the first, was entirely withdrawn, and the.order sustaining the first decree rescinded, and the cause left still on the re-hearing, and it has been fully and ably re-argued on belli sides, and.wo have now to decide whether the first decree is to stand unaltered, or to be rescinded
We mention these circumstances, not that the frequent re-hearings may become a precedent; but rather to prevent them being so hereafter; and hesitate not to'say, that we will grant no such indulgence to other causes.
It is insisted, on the part of the appellants, that the deed of trust executed by 'Williamson, is fraudulent and void, so much so that White or his representatives ran take advantage of it, and that in its behalf the chancellor ought not to interfere.
That the title of White is a valid title, and having the legal esiate, he lias got it meritoriously, or so much so that he can repel the claim of the complainant’s below, in which there is no merit; and that as he has acquired the legal cstqte without notice, ha, is entitled to hold it.
That the title set up by the complainants has no-merit. That the sale by the trustees to Thomas Crv Prentiss, was collusive and derogatory to the rights, of others — that it was for the benefit of Haggin, or for individual benefit, and not for the benefit of creditors; that no money was paid, and that this hill is it*, fact for the benefit of Haggin, one of the trustees^ *503 ami not the bill of Prentiss; and that Haggiri claims the estate by some unexplained contract with Prentiss, without payment, and that there is too great a mystery over this title to permit a court of equity to lend its aid in drawing the estate from White, and that the conduct of the.trustees deluded the ticket holders in the lottery.
Grounds ie!ied on by t?io heirs of Fren.tis.
Ts not an os, tafo conveyed by debtor to trustees for creditors Butject to loss by the fraud of trustees, and debtor on a bonajide purchaser from the debtor, without creditors participation ?
*503 On the other'side it is contended, that the deed of trust is valid, and that White or his representatives, do not stand in an attitude to question its validity, as it is binding on Williamson, and those claiming under him.
That the title of White is acquired by a species of gaming, and is, therefore, invalid and immoral, and such as he ought to surrender to Williamson or his alienees.
That White has no right to impeach the title of the plaintiffs, or to call the trustees to an account of . their actings and doings in the trust; that the sale to Prentiss was fair, and without mystery or concealment; that the bill is to be treated exclusively as the bill ofPrentiss, and tie as a bona fule purchaser from the trustees; that his representatives cannot be affected by the acts of Haggin, or his answers in this cause, to the interrogatories of White. And that the acts of the trustees in conniving at this estate going into the lottery, cannot affect Prentiss, a purchaser under them, because the trustees acted for creditors, and sold the estate to Prentiss, who is a purchaser under the creditors, and no act of the trustees, with regard to the lottery could prejudice the rights of the creditors for whom they act.
These different points present at least a sketch of the matters of controversy debated at the bar; and some of them will.now receive our serious consideration.
We shall not enquire minutely into tbo merits of the deed of trust, and whether it be or be not fraudulent as to creditors, because we do not deem it necessary to a correct decision of tiie- cause.
If it be conceded that the particular creditors secured by the, deed, chose their trustees; that Williamson ‘agreed to give them the preference; arid that each one,* as well as Williamson, without any fraud- *504 «lent intent, agreed to every feature of the deed, (which is as favorable a ground as the transaction can be placed on,) it then follows, that the trustees do represent the creditors, and can act for them, and bind them,at least to some extent — and that the trustees alone, need be parties to any transaction to bind the creditors. But will it thence follow, that this estate is of a priviledged order* and that the trustees may sport with it as they please, or allow Williamson to do so, and to delude others therewith, and yet the estate be in no danger of loss, because, that the concern of the creditors will compel deluded purchasers to abide by oM the- consequences of the deception?
if trustees to an equity con veyod by debtors fur bis 11 creditors encourage and induce a stranger to purchase the estate from the debtor, & he.'loesso pay for it, and obtains the legal title from debtor's venders where it had remit in-«'I, he shall sot be disturbed.
7 cartees in dea’ing with strange.! s, are in tbu í'i nerab governed by the same rules as the holder of the absolute estate; and by their deception may lose the property;
*504 To illustrate this, we Will suppose, that White had been about to purchase this estate, at an auction made by Williamson, at which the trustees attended —That White should have understood, that the legal title was in Saunders, who was willing to con vey, on receiving the balance of the purchase mo ney; and that Williamson held Saunders’ bond— That White had advised with the trustees in a friend ly manner, as to the propriety of his making hi? purchase, and that they should have encouraged, ana held out inducements to him to make the purchase; and that he should have done so, and paid up to Saunders the purchase money due him, and to Williamson the residue of his price, and received his convey anee, and surrendered the bond of Saunders to him; and that so soon as he had completed his-purchase and parted with his money, the trustees should draw from their pockets, their equity held by their deed of trust, (and they hold hut an equity,) till thi.moment concealed from, and' unknown to W bite, and should demand the estate from him, and bring the» bill iir chancery to enforce it; and White was to rely on this fraud, could they shield themselves from its effects by replying, Unit they represented creditors,, and as the creditors were not guilty of the deception. White could not complain?
To this it may be answered, that he would hero shield himself by the plea of an innocent purchase, for a valuable eon i.kraiion, without notice.— To which we reply, that the very fact of his being *505 finable to do so; proves that the trustees, when they come into contact wifli strangers, are in some measure at least, subjected to the same rules which govern other holders bf title, or other complainants in chancery, when they get without the trust family, and deal with"strangers, But we will strip White of the legal estate, and say that in the purchase in which we have supposed, he acquired ah equity only, and was induced to part with his money to obtain it, by the representations of the trustees, and that they were afterwards to produce their equity against liis, and claim that theirs was held for creditors, and was oldest; which ought to be prefered? And could lie be made to loose notwithstanding the deception they had practised? The answer tb this enquiry in the negative, as it must be answered, will sh:ew that trustees aré not exempted- from the conscientious rules of conduct which govern other individuals when they deal with strangers. In that case, their consciences may be reached as well, as others, and they, and those they represent, must oftesi abide by the consequences.
The rule that no act of neglect of the trustees, shall prejudice the cestui que trust applies only to the . parties to the trust, & those dealing with the trusees as such," having notice of, and claiming under the trust;', and not to the case of • strangers.
We acknowledge the rule as laid down by Cruisej and relied oti in argument, “that no act of a trustee shall prejudice the cestui que trust; nor shall the forbearance of trustees in not doing what it was their office to have done, prejudice the cestid que trust; since, at that rate, it would be in the power of the trustees, either by doing or delaying tb do their duty, to. affect the rights of others.” 1 Cruise Dig. 541. But this rule applies exclusively between the cestui que trust and the trustee, or persons dealing with the trustee as such, and having notice of, or claiming under the trust, and is not universally true as regards strangers, and the cases cited by Cruise, 3, Peer. Will. 214, and 2, Peer. Will. 706, prove this restricted application of.the rule, and are decisions between the trustee and cestui que trust, or those claiming the benefit of the trust.
The exception as to strangers is acknowledged by ¿lie same author,
A purchaser for a valuable consideration, without notice of the trust, as we have already seen, is acknowledged to be one discharged from the claims of *506 the cestui gúe <rust. h. trustee is said to be barred by afine and by the statute of limitations, as other claimants are against strangers.
. , . as such, is in someca°es,as reject ofthe price, and must sec its application,
Property may be lost to cesbT thi^nerfigenre of the thrrT•’ d n deluding1 W strangers to purchase it. 'White obtain title1 without notice of the conveyance intrhst.
Ropenalty b^the^ct'^of I:l69&°779 or the purchaser of tick ?otteHe"and they wore not participes crithe^makrts of the lottery— on these ail wero’lmlof-3 ed,
Executors and administrators are trustees representing the estate of the decedent, and the ínteres:, of creditors and infants? and yet they are bound by the same morality, and the same rules of fairness and propriety in their dealings with strangers, as other individuals, and after they lose the estate by their supineness or their fraud with strangers, and feel the effects of their conduct in their‘responsibility to those they represent.
it is true, a purchaser from a trustee with notice of the trust, is in some cases, compelled to see to the. appropriation of the purchase money. But in this oasp* hp & purchaser with notice under the trust? in ether words, he has voluntarily, to some extent, substituted himself in the place of the trustee, and of course bears some relation to the cestui que trust.
If property cart be forever lost to the trustee and cesfu{ qUe trust also, and become the property of attother, by mere negligence, delay or lapse of time, is it against the rules of either equity or law, to subject them to the same loss, when they have connived at placing it in the hands of strangers, by deception or delusion? Certainly not.
We will now pay some attention to the title ac> quired by White. It is a dear legal estate, and the possession united. It is true, he. got it by becoming a purdiaser of a ticket in a lottery, and drew it as a prize? but got it with total ignorance of the equity claimed by the trnstecs under their deed.
We do not admit that he obtained the estate in vi°^af*on the laws of the land, although we may not be able to applaud his morality in the adventure. There was no statute in force against this lottery at {¡K> ?jme the tickets were sold, and the, prizes drawn, except the acts 1769 and 1779, 5, Litt. L. K. 587, 589, and neither of these arts impose any penalty or» the purchasers of tickets in private lotteries. They aFe n<>* supposed to be guilty of any offence., and on the makers of such lotteries alone, the penalty is imposed Hence, there is no such tiling as applying tlie doctrines which affect participes criminh to their case.
The'prizes drawn in such lotterisa were lawfully held.
One who acquired the title and possession of land as a prize in a private lottery, might allege a deed of trust made by the maker of die lottery under which complainant claims an elder equity, was made ill fraud of creditors.
So they might also allege the trustees had permitted the estate to be held out as a lure to him to make the adyentijrc.
They are not in pari dclictn with the seller of the tickets, or those who aid anil encauPage him If he receives the money, it may be recovered hack, if they fail to pay it, he cannot coerce it. The purchaser, therefore, is rather treated as the favorite of the law — the party whom the law meant to protect again'st the effects of private lotteries, if, therefore, any ticket-holder gets hold of his prize, these acts furnish no means of getting it back, either in a court of law or equity.
it remains yet to Be derided, what grade of title, the estate acquired by White belongs to, and who. can compel him to surrender it. Certainly Williamson could not.
We would not be understood as deciding whether* White’s title could, or could not be reached in favor of trustees or creditors, to whom the equity therein, had been conveyed, in case be had got the title without their consent or approbation — for such a caséis Slot before us.
We cannot assent to the position that White is such a holder of the. title, as cannot be allowed to enquire into the merits of his adversaries claim, and dispute with them the fairness of their demand. Ho has the legal estate derived from the same person mujer whom the trustees claim, and that estate is good against Williamson. Can another claiming under Williamson, therefore, estop him from enquiring into the merits of their claim, hnd are they not compelled lo come into court with clean hands as well as other suitors? Certainly they are, and White has the right to see that they are clean, and he would have that right, standing in the attitude of a. defendant, and holding the possession, although he had acquired his claim by swindling and fraud. This gives him a right to enquire, to some extent, into the merits uf the deed of trust.
If they present themselves, in the attitude of trustees for meritorious creditors whose interests were secured by the deed, ho has a right t.o contest the fact, and to retort that they are a.set; of, mpn combined with Williamson, not. to.secure, but. tp, defraud the rights of creditors; that all is a.combination to impose upon and. cheat others,, instead: of. *508 paying the debts due to them; and for this purpose he has a right to avail himself of all proper inferences, which can he drawn from any of their acts in conducting the trust.
T-he prize, holder could not in such case have the deed of trust 'cancelled; he coidd only-resist its effects asruiust , . ° i * |um.
3f trustee? of the estate conveyed by debtor for creditors,' stand by and see (he debt- or publish’ a lottery of th’e property, soli the tickets, complete the drawing and collect the price of the tickets, the fortunate persons drawing & obtaing the possession of the prizes shall hold them.
*508 Besides, if their claim was originally intended to secure and not to defraud creditors, he has a right to charge them with such maleonduct in manageing the trust as would i'ose to .them the estate for-evpr, by shewing that they have so managed the estate as to, permit it be held up as a lure to deceive others, and induce them to risque théir money foe an interest in it, either legally or illegally, whereby some of it has really escaped, into his own hands, and then when they attempt to regain it, to prevent their doing so, and to leave them to the consequences of their imprudence.
' We would not be understood as deciding that White is one of those who can oppose this deed and procure it to be declared void under the act to prevent frauds and perjuries This belongs to creditors alone whose rights are affected thereby. What we mean is, that standing in the attitude of a defendant, and deriving the legal estate from Saunders, he is not estopped by the deed of trust, to resist its effects upon him. He may show it to be a sham and not a reality — -to be so managed as to delude him into a loss of .his money, and after lie, had parted with that, to be used as a snare to catch the estate also.
A little attention to the facts concerning this lottery will show that the conduct of the trustees in relation to it, was deceptive, and cannot bo justified, even if it be conceded that the deed was at first pure," and designed as a real security for creditors.
The deed embraced a large estate, some personal and some real] The former was liable to perish or he wasted; the latter might be endangered because the title to part, as in the case of this farm, was incomplete and equitable oñly. The. trustees by the execution and acceptance of the deed took the title and the right of possession, and their acceptance amounted to nothing less than a stipulation with the creditors that they would safely preserve it, and dispose of it for the payment of debts. Williamson was to be no longer the owner; for he could not *509 be trusted with it, aml.it is placed for this very reason into their safe keeping.
In such case doe« a sale at auction of the estate by the trustees to a creditor puss to the purchaser an equity the trustees had forfeited or could not ag? serf?
They soon after made him their agent .and manager of the same estate, feeling a confidence in him as they state.
Some time after liis agency commences they see that by public advertisement he had engaged the very same property to the public at large, or at least to every one whom he could induce to buy a ticket, as prizes in a lottery for his own benefit. Of this scheme they are,fully cognizant at every stage, and according to the most favorable statement made for themselves, they resolved to be silent and not interfere. What could have been their motives for this silence, and suffering this imposition to proceed against the laws of the land, and the creditors whom they represented? Could they have determined to let Williamson go on with the sport, and get all the money he could by this deception, which might do him some good, and to rest securely on their dped till it was over, and then by its power take back the estate, and open the eyes of the deluded purchasers of tickets to their cost?
We will not impute this to them; but only say— what they seem to admit — ’that they intended to let Williamson proceed, and if he got money enough to discharge his debts, then the trust would be useless, and they would be-discharged from its duties, which was their probable hope. But if he failed, then they could but exert their power under the deed, and take the estate from those who thought they had securely got it as prizes — a disagreeble part no doubt for the trustees at last to act, yf necessity compelled them- But it is one that is now attempted, and the question now is, has not this estate got beyond their reach?
We may add to all this, there was not only a tacit approbation of the lottery scheme, but two of them actually interfered to prevent the truth of the matter being made public, when threatened by a creditor; a strong evidence, that they had authorized the lottery, and fostered its success, and took care that it should not?be defeated. Under such circumstances, we can have no hesitation in saying, that if this *510 was a control ersy exclusively between the trustees and Vl hiie, and if they had sued to recover back, on their- equity, which had been more than trifled with, the legal estate from White, who was one of the ticket holders; a court of equity ought to dismiss their bill and afford them iu> redress, however pure their equity might once have been.
o”«fn equity takes.it subjeot to any baudsoToth ers, and if that equity is m the hands al grantor of the equity udeisinflexi ne, '
Where the equityisoutthird person, amt he'conoeals it till oompleies°his purchase, it shall hat pre- ~
But since all. this they have, and as they allege, at the request of the creditors, set up this estate at auction, now in the hands of White, and Thomas Brcntiss has bid it off; ano they have executed to him a writing evidencing bis bid, saying nothing about the payment, but engaging to convey to him sucj, eR(-au; as they hold under the deed, and he sues to regain the estate, and the question now arises, has this sale and bid by Pientiss, and certifícale of ^ie trustees so re-invigorated and revived lilis equity, once dead, in the hands of Prentiss, as to enable him to recover the estate, without these equiiy-kilU ing acts of the trustees tying in his way? Or must he take the estate as they held it, affected by the same clog, or palsied by the same disease? This latter question was answered in the affirmative by the first opinion. Against this the arguments of counsel for the appellees have been principally directed as an erroneous assumption of principle by the court.
it is a rule too will settled at this day to be. questioned that the assignee of an equity, takes it subject to any equity against it, in the hands of others, if that opposing equity is in tire- hands of the original grantor of the equity assigned, the rule is inflexible, 2 Ver. 69, 764 1 Peer. Wm’s. 496, 1 Vez. 123.
The only exception to the pule that wc have met with is the case of an out-standing equity in a third pC£.S0|, which ivas kept a secret till the assignee liad completed his purchase — an exception recognized in Murray &c. vs. Litburn &c. 2 John, Chy. Rep. 441.
But to this .exception the claim of White is not analogous. He holds the legal estate, and if it bp a{|n,itted that be holds it without merit, still his. claim is no secret and he has the repelling equity of *511 the delusive conduct of the trustees touching the lottery, and it follows that he can assert it against Prentiss who purchased from the trustees. If Prentiss can claim an exemption from this repelling equity of White, it must be by shewing that ignorant of the circumstances, he had not only bought, but actually paid a valuable consideration. .This lie has not shewn, and we will soon see that this is an important ingredient lacking in the evidence of the complainant.
In such case Che assignment must be for a valuable consideration and with-out notice.
Argument for Prentiss on the ground that by his purchase he acquired the equity held by the creditors winch had not been effected by the acts of the trustees — — not allowed.:'
fo entitle Prentiss to urge this argument he ought to shew not only that he had paid the purchase money but that it had been applied to the payment of 'the debts for which especially the trust was created.'
But it is insisted that the creditors are the real persons interested; that their equity accrued before White’s title, that that title -though' acquired by White in ignorance of the claims of the creditors, yet it is not sufficiently meritorious to protect him, the want of notice notwithstanding; that they not having been shewn to have connived at and fostered the lottery, their rights are not affected thereby, and that Prentiss having purchased under a sale for their benefit, is clothed with their meritorious equity, and has a right to claim over the head of the improper acts of the trustees concerning the lottery.
This is the strongest attitude in which Prentiss cars he placed, and its importance will be considered. •
The trustees do represent the creditors and can bind them by some of their acts and to some extent beyond a doubt. But we shall soon see that it is wholly immaterial whether they are bound by the acts of the trustees to lose this, estate or not, or whether the trustees are the only proper parties to prosecute and defend their rights in court or not, or whether decisions for or against the trustees will be conclusive on the creditors or not. On these points we will express no opinion, especially as th'c creditors are not parties. /Cither way, precisely the same .consequences will follow.
if the creditors are bound by the acts of the trustees, and this decision shall conclude their rights as far as to prevent them from touching their land, then their equity is lost in the bands of the trustees before the sale to Prentiss, and they are in no better situation by the acts, of their representatives than *512 these trustees themselves, who we have seen could not recover, and then there is an end of the question. If, on the contrary, the creditors are not affected by these acts of the trustees which we have disapproved, then it was incumbent upon Prentiss to shew that he was fully possessed of their equity 5 and how ought he to shew this? We answer by' shewing that he had paid the money for their benefit — by seeing to its faithful and due appropriation, which he has utterly failed to do, either by proof or oven by an explicit answer.
Where lands are conveyed payment ofC pertain specified debts must'see tcT*” the appropnation of the !”wi«e where" te conveyanee is for df^c’bts^cii«¡rally. °
ft does not appear tho price Prentiss bid for tbe land was ever paid the creditors secured by tbe deed of trust.
*512 The rule on that subject is well settled that where lands are conveyed in trust to sell for the payment 0f cerfajn debts specified in the deed or instrument, R'R purchaser from the trustees must see to the appropriatiori of the purchase-money, or his title will inefficient against the creditrrs who are the ces- ^ Que intsi- On the contrary if the conveyance is in trust with powers of sale for the payment of debts generally without specification, a purchaser an* ^er ^ie (!>ust *s not bound to see to the appropriation of the purchase-money. These doctrines will found clearly settled by the following authorities, 1 Cruise Dig. 542, 543. 1 Vern. 260, 301. 1 Vez. 173.
Now this deed is notone for the securing-and pavment of debts generally, but the estate is to bo sold for the payment of particular "debts, every one specifically enumerated. It was, therefore, incumbent on every one claiming to be clothed with the claims of the creditors, to shew that he was indisputably possessed of their equity, by shewing the appropriation of the money to their benefit, espe dally in a case where the party relies on their claim as sufficient to exempt him from the acts of the trustees which deluded him into the lottery scheme, and caused him to part with the price of his ticket, as well as many others, whose money evidently went to pay the balance of the purchase money due from Williamson to Saunders, to procure the legal estate for White.
Instead of shewing this, Prentiss has proved s. naked bidding off of the estate, without a cent paid and appropriated to the debts of the creditors, and *513 «aven the instrument óf writing evidencing his purchase. from the trustees .does not pretend to state that he has either paid or secured the money. The only information given on this subject, and it is very sparing, is in the answers of the defendant Baggin, and we sail not say what weight they ought to have when attempted to be used against Prentiss; we shall now only touch upon their weight in his favor. There is a refusal - to state explicitly how much was paid, to whom, and in what.
White bad the right, if Prentiss could derive an equity from’ the creditors by the payment to them of the nurchase money, to require proof of the payment.
But all this is attempted to be overthrown by insisting* that White bad no right to ask these questions, to make these enquiries* or put these matters in issue before lie surrendered his estate. This position we are convinced cannot be sustained, and on more mature reflection must, and we trust will be given up. t'o say that White should possess the legal title and possession, that he should be called on to surrender it, and yet be eslopped to enquire to whom, and what are the merits of the claim which assails him, would he leading him to the contest fettered, and under the prospect of certain defeat, an instance of which cannot be found in the registers of a correct chancery. We do not say that White is entitled to settle up all the trustees’ accounts, and look into the disposition of all tile es-fate; but as far as the price of this estate is concerned, hedías the right to ask for its disposition and appropriation, and with this there is a refusal to gratify him. The complainant sets out a deed from Williamson to trustees to secure and pay debts, and calls upon White to surrender the legal estate, and the possession, and to pay up the mesne profits. He denies that the deed is for the payment of debts, .but to defraud creditors. The complainant replies this is no concern of bis. White insists if it is an honest deed the trustees have acted in such a manner as to destroy the merits of their equity, or of others claiming under them, as to him, and sets out this plea in bar in ful). The complainant protesting against his right to use this matter in defence, replies that he comes clothed with the superior and meritorious equity of the cestui que trust. the creditors, whose equity is prior and superno* to all, and *514 such as could not be affected by the improper acts of the trustees, in which thé.y did not participate. White rejoins traversing the fart of claim under the creditors, and declares iri avoidance that the purchase was not for thó benefit of creditors, and that they received none of the purchase-money, and demands proof 1 hat they did. Here the complainant denies and insists that this matter is not well pleaded; that, these are matters with which White has no business —in short that they have a right to recover on facts, which White cannot dispute, or avoid. To state this proposition Is to refute it. We know of no such an estoppel in the rules of equity.
The payment and appropriation does hot appear.
That Prentiss represented the Kentucky Insurance Company, ■whose charterhaving expired, had no existence, to whom Williamson’s sureties had been bound in obligations against which the conveyance ivas to indemnify them, and made the purchase for the company and-Caused the netos lo be cancelled, was not a payment and apuro-nation of the purchase money — For,
If then White has a'right to enquire into this matter, we repeat there is no evidence of its truth, but on the contrary a disclosure of some facts which destroy the presumption of a purchase for creditors
Prentiss is said to have represented the late Kentucky Insurance Company, or the debts due to it. This company was not a creditor secured by the deed, nor was Prentiss a creditor, and in this wc correct a statement to the contrary inadvertently made in tire original opinion. Only some endorsers or sureties for Williamson to that bank, were indemnified against these responsibilities by the deed, and when Prentiss purchased to secure, as is alleged, the debts due to this institution, and he acknowledged that he bought for the bank, it was not in existence, but bad expired by the terms of its charter. It is said that it was expected the legislature would bring it again to life, and the sale was a provision for this expectancy, which was shortly thereafter fulfilled, by the passage of a continuing or reviving act for a limited period. If this be so, there could not be much necessity for parting with the estate to secure a. non-existing creditor, whose future existence was at least somewhat uncertain. and if it did revive, its debts could be discharged with its own paper ihen admitted to be wofully depreciated; and these debts, if v.e can understand :in* diBrlosure.of the answers, are ail that were satisfied by the sale of this, as well as other estate *515 of large value. Such a payment cannot be a. sufficient appropriation,even if proved, to clothe Prentiss or iiis heirs with the superior unaffected equity of the creditors, if such equity exists.
Jhe corPora'’ creditoi because it was. "ot in exis"-
lt the survi-. voro''twoex-_ ecutors (o whom the estate h:id been, devised for payment of debts, stand by and see one purchase from the person to whom the other had sold by parol a parcel of the land on which the testator '.eld a conveyance bond, and afterwards oa3-s a balance of the purchase-mo-ey and obtains (be legal ti!le, he must surrender it without biug reimbursed.'
We have thus far considered the case between Prentiss and White which was as far as it was considered in the original opinion, and ue have arrived at the conclusion that that opinion, although, not as fully or even as accurately expressed as it might have been, is substantially correct, if it is not, then the rase of Springle and Bibb’s heirs vs. Morrison cited in that opinion and reported in 3 Litt. Rep. 52, is indubitably wrong and must he overturned.
There Morrison was but an executor and trustee of the estate of George Nicholas, and held the real estate devised in trust, for the benefit of creditors and legatees, and as such he held a superior equity, and stood by and saw Jordan who had in fact no equity, sell this same estate to Smith, and Smith to the ancestoys of the complainants, lie stood silent or rather encouraged these sales, and never intimated his superior claim. The purchasers evidently took no equity from the vendors by these sales, and Morrison afterwards advanced, as executor, a considerable sum of money to remove a still superior lien standing out in the hands of the legal title holder, and clothed himself with this superior lien, and the legal estate. Yet for his deluding the ancestor of the complainants, and his-vendor, by, encouraging their purchases and not disclosing, his title, he was decreed, trustee and executor as he was,,o iihout regard to the interest which he represented,.to, sucre tider this l$gal estate and subsequently acquired lien, without a restoration of the money advanced, by him to acquire the legal estate.
it is worthy of remark that his learned counsel, ft) a petition for a re hearing relied on the point.thatr Morrison was but a trustee, and executor, arid as,, such could not by his improper acts, lose the estate, of those whom he represented; yet the petition was, overruled and the opinion ordered to stand unaltered. If it was correct to make this trustee actually convey away an estate oat of the trust fund* be *516 cause be trifled with the rights of others-so far its †0 be slightly instrumental in causing them to buy a bad tifie, and part with their money; certainly it cannot be wrong to refuse to restore an estate to or their vendee, who lias already been inytrumental in placing fhe title where it is, by del'll - ding the bolder, although that holder may fall short of the merit of an innocent purchaser, for a valuable consideration, without notice.
Osie who em-coin-aged the lottery ^acte'd more against taw than the theCticket” who drew the P«ze-
We have thus far considered this matter exclusively between Vt bite arid Prentiss as a purchaser from the trustees of a bare equity which they claim, and we cannot still get Prentiss or his heirs over that bar which the trustees have placed in his road, on principle or authority. We do not deem it necessaiy to pursue the enquiry further or determine whether this is to be considered as the cause of llaggin the trustee or that of Prentiss, convinced as we are that Prentiss, having acknowledged that be bid for a non-existingcreditor, and one who, by the deed bad no direct interest when existng, and having shewn nothing hut a mere bid without payment, cannot even, claim the shoes of the creditors, if that would be an advantage, but only stand in the place of the trustees who ought not to be aided-after their conduct with regard to this lottery.
They, (he trustees, acted more against law In fosteri-ng the lottery than White in purchasing ¡its tick- and drawing hi-5 prize. The law placed all its penalties, on the party to that lottery whose cause they espoused, and'was designed as a protection to the purchasers or to prevent deception and imposi^°n uPon them according, to the principles of Gray vs. Roberts, 2 Marsh. 203. *
Jt cannot, therefore, be right to. take this protection from such purchasers in a court of equity by-relieving the side who aided the violation of law.
The former opinion and decree nyast stand una!. fpred and affirmed,